ALBERT E. ENTZIAN ET AL. *v.* PRINCE
GEORGE'S COUNTY, MARYLAND ET AL.

[No. 1282, September Term, 1975.]

*Decided July 1, 1976.*

The cause was argued before MORTON, ▮GILBERT and LOWE, JJ.

*Jess James Smith*, with whom were *Burroughs & Smith* on the brief, for appellants.

*Barbara J. Lampe, Associate County Attorney*, and *Ellis J. Koch, Deputy County Attorney*, with whom was *James C. Chapin, County Attorney*, on the brief, for appellee Prince George's County, Maryland. Submitted on brief by *Frank M. Kratovil* and *Charles M. Cockerill* for other appellee.

Lowe, J., delivered the opinion of the Court.

Parties to zoning cases are provided with more attention than are the parties in most other forms of litigation. Although there are slight variations in the several counties, generally a zoning application proceeding begins with an administrative hearing where the applicant and those opposed to the application may appear and offer testimony and other evidence. The hearing officer may utilize available county or municipal investigative sources (*e.g.*, technical staff reports of planning commissions) for additional fact gathering. The hearing officer then renders a decision based on the evidence elicited at the hearing. This decision, while not conclusive, is often persuasive to the quasi-judicial body which makes the ultimate decision as to whether to approve the application. This body may be a board or commission which has been statutorily provided for that single purpose, or, it may be the governing legislative body of the county which has been authorized to sit in such quasi-judicial capacity to decide zoning matters.

The County Council of Prince George's County convenes in matters of zoning as the "District Council." An appeal of right from the Council's decision is provided to the Circuit Court for Prince George's County and, from there, to this Court. The Council's decision is not to be overturned if it is supported by competent, material and substantial evidence in the record. If the issue is fairly debatable as shown by the record, the Council's decision will be affirmed. *Prince George's Co. v. Meininger*, 264 Md. 148, 152; *Wakefield v. Kraft*, 202 Md. 136. This test applies to applications for a zoning change as well as a special exception. *Zengerle v. Bd. of Co. Comm'rs*, 262 Md. 1, 17. Our role on review is the same as that of the circuit court looking to the legality of the

procedure and whether fairly debatable issues were raised by the evidence.

Appellants applied for a special exception for a sanitary landfill in Prince George's County at a location near the Patuxent River. It was denied. After a thorough review of the evidence, the District Council,[1] in a comprehensive opinion, concluded:

> "That the proposed use is not in harmony with the purpose and intent of the Zoning Ordinance; and will substantially impair the integrity of the approved master plan for this area, including the functional plan for this activity; and the proposed use would affect adversely the health and safety of residents in the area and would be detrimental to the use and/or development of adjacent properties or the general neighborhood."

An appeal was noted in the Circuit Court for Prince George's County wherein appellants contended substantially that which they argue here. The trial judge, the Honorable Ralph W. Powers, wrote an opinion concisely responding to the appellants' contentions and, after correctly stating the burden of proof and standard of review in such cases, affirmed the District Council. We adopt Judge Powers' opinion as our own and, because it so clearly articulates the facts and issues here presented, we repeat it before further comment.

### "OPINION AND ORDER

This case comes before the Court on appeal from a ruling by the County Council of Prince George's County sitting as the District Council. The statutory basis for this appeal is provided by Maryland Rule B1 in conjunction with the special authorization granted by Section 79(e), (f), (k), Chapter 780, Laws of the State of Maryland, 1959, as amended.

---

1. The District Council opinion is appended hereto for referential purposes.

This appeal concerns a denial by the District Council of a special exception application by The International Disposal Corporation of Maryland, Inc., and others, (hereinafter referred to collectively as 'International').

The proceedings involved an application to use 268.80 acres (later amended to 180 acres) as a sanitary landfill, a use for which special exceptions may be granted. §28.31 *'Special Exceptions'*, *Zoning Ordinance* for the Maryland-Washington Regional District in Prince George's County, Maryland.

Section 28.334A, Zoning Ordinance, empowers the District Council to grant a temporary special exception for a sanitary landfill in any O-S, R-A, or R-R Zone. The tract of land involved is on the east side of Mill Branch Road, just north of its intersection with Queen Anne Road in Prince George's County, and is zoned R-R.

After public hearings on the matter, the District Council, on April 28, 1975, disapproved the application for special exception. International timely appealed this action asking that this Court reverse the Decision of the District Council avering that the action of the District Council was: (1) in violation of constitutional provision; (2) in excess of the statutory authority or jurisdiction of the agency; (3) or made upon unlawful procedure; (4) or affected by other error of law; (5) or unsupported by competent, material and substantial evidence in view of the entire record as submitted; (6) or arbitrary or capricious. These six allegations of error are those which allow the Circuit Court to reverse, modify, or remand a decision of the District Council. §79(i), *Chapter 780.*

The scope of review by this Court of the administrative decision of the District Council is governed by statute. There must be substantial evidence on the entire record such that the decision

rendered by the District Council was not arbitrary or capricious. §79(i) (5) (6), *Chapter 780*. This is the typical standard of review the courts employ in reviewing denials of special exception applications. See *Rockville Fuel and Feed Company, Inc. v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183. (1970)

The District Council pursuant to its delegated authority granted by the General Assembly of Maryland, (Chapter 780), has by ordinance determined that special enumerated uses can be properly allowed in a specific use district. §28.31 through 28.359, *'Special Exceptions', Zoning Ordinance,* supra. There is a presumption of validity and correctness that the enumerated special exception uses promote the general welfare. *Rockville Fuel,* supra.

A special exception application passes through three administrative levels before reaching the District Council. These are in chronological order: The Technical Staff of the Prince George's County Planning Board, the Prince George's County Planning Board, and the Office of the Zoning Hearing Examiner. The Technical Staff is required to make a report and recommendation for the record on each application for special exceptions. *Zoning Ordinance,* supra, §28.111. The County Planning Board, among its exclusive local functions, is responsible for either adopting or not adopting the recommendations of the Technical Staff, and forwarding this to the District Council. *Chapter 780,* §66.

Before the District Council can make a decision on a special exception application, the Zoning Hearing Examiner is required to hold public hearings on the matter. *Zoning Ordinance,* supra, §28.12, §31A.1 - 31A.49. At the conclusion of the hearings, the Examiner must file with the District Council a written decision containing specific

findings of basic facts, conclusions of law and a recommended disposition of the case. *Ordinance,* supra, §31A.22. His decision is then considered by the District Council. *Ordinance,* supra, §31.A.3.

The standard the District Council must use in determining whether to approve a special exception application, thus restricting their discretionary scope, is governed by ordinance.

'28.2 General Provisions

A special exception may be granted when the Council finds that:

(a) The proposed use is in harmony with the purpose and intent of the Zoning Ordinance and will not substantially impair the integrity of any validly approved master plan or functional master plan, or in the absence of a master plan or functional master plan, the General Plan (Amended 10/29/74).

(b) The proposed use will not affect adversely the health and safety of residents or workers in the area and will not be detrimental to the use and/or development of adjacent properties or the general neighborhood.' *Ordinance,* supra, §28.2

In accord with *Rockville Fuel,* supra, then, the burden was on the applicant to demonstrate to the Council that the proposed use will not: (1) substantially impair any master, functional master or general plan; (2) adversely affect the health and safety of the area residents and workers; (3) or be detrimental to the use and/or development of the adjacent properties or the general neighborhood. Since these predetermined enumerated uses are prima facie in the interest of the general welfare, there is no burden on the part of the applicant to show affirmatively that the requested use will benefit the community at large. *Rockville Fuel,* supra.

International's argument on the adequacy of the evidence on the record centers around the three-prong test the Council must consider under §28.2. *Ordinance,* supra. International proffers that there was no showing that a comprehensive plan would be impaired [§28.2(a)]; that there was not substantial evidence demonstrating that the landfill would adversely affect the health and safety of area residents or workers, or that the landfill would be detrimental to the use and/or development of adjacent properties or the general neighborhood. [§28.2(b)1]. Concerning the last point, International maintains that the boundary of the 'general neighborhood' was never defined so as to permit a factual finding of detrimental effect.

The District Council has not adopted any rules of evidence to apply in its public hearings. We revert to case law which applies the general standard applicable to administrative bodies:

'In general, administrative agencies are not bound by the technical common-law rules of evidence, but they must observe the basic rules of fairness as to the parties appearing before them.' *Dal Maso v. Board of County Commissioners of Prince George's County,* 238 Md. 333, p. 337. (1964). Followed in *Dickinson-Tidewater, Inc., et al v. Supervisor of Assessments of Anne Arundel County,* 273 Md. 245. (1974).

While zoning agency bodies then are not bound by strict rules of evidence, their decisions must be supported by substantial evidence on the record. *Rockville Fuel,* supra. 'Zoning is not a plebiscite' and therefore testimony in opposition restricted solely to lay witnesses, petitions of objection to the proposal by residents, and testimony amounting to unsupported dislike and fear of (a) project, '. . . amounted to no evidence at all.' *Rockville Fuel,*

supra, pps. 192 and 193. There is ample evidence in the record to support the decision of the District Council here. The Technical Staff and the Planning Board both recommended disapproval of the application (Ex. 95) based largely on the impact of the proposed site on the adjacent Patuxent Watershed. (See Patuxent River Watershed Committee Report, Ex. 95). The Technical Report is by statute, part of the record. *Zoning Ordinance,* supra, §28.11[1].

The General Assembly of Maryland has declared that 'the policy of the State is to protect the water quality of the State scenic rivers system, (of which the Patuxent is a part) and fulfill vital conservation purposes by wise use or resources within this scenic river system.' *Annotated Code of Maryland, Natural Resources,* 8-401, 8-402(a). Development of these rivers are limited to those 'programs by which the general public can appreciate and enjoy the value of these areas as scenic rivers in a setting of natural solitude.' *Natural Resources,* supra, 8-402(b).

> 'Before specific plans for use and development of water and related land resources are approved . . . which change the character of a river or waterway or destroy its scenic value, full consideration and evaluation of the river as a scenic resource shall be given.' *Natural Resources,* supra, §8-405.

> Finally, 'Every State unit shall recognize the intent of the scenic rivers program and take whatever action is necessary to protect and enhance the scenic qualities of the designated river.' *Natural Resources,* supra, §8-407.

To effectuate the State policy of the Scenic River Act in Prince George's County, the Patuxent River Watershed was created. *Natural Resources,* supra,

Subtitle 13, §8-1301 — 8-1319. The General
Assembly declared that:

'(F)lood prevention, conservation, sediment
or erosion protection and prevention of urban
development within the watershed is a public
benefit and conducive to the public health,
safety and welfare.' *Natural Resources, supra,*
§8-1302.

In Prince George's County, the Maryland-
National Capital Park and Planning Com-
mission (Commission) is the duly designated
agency to carry out the provisions of the Patuxent
River Watershed Act. *Natural Resources,*
§8-1301(b), §8-1304. The Commission may adopt,
amend, or extend the watershed plan (*Natural
Resources, supra,* §8-1305) and acquire, improve,
and develop land or other property within the
watershed. *Natural Resources, supra,* §8-1307. At
the time application 2799 was pending, the
Commission had acquired approximately 5,000
acres of a projected 15,000 acre watershed park,
spending over three million dollars in public funds.
See *Council Decision,* p. 7; and *Technical Staff
Report,* p. 10, Ex. 95. In addition, the Commission
may acquire lands outside of the area of the
watershed plan if it finds:

'(T)hat acquisition is necessary to preserve
any portion of the watershed plan in its
county.' *Natural Resources, supra,* §8-1309.

The proposed landfill originally contained 207.19
acres, some within the park-take line. The amended
application reduced the landfill site to 180 acres,
none of which was within the park-take line, but
some of which adjoined this line. In conjunction
with the State policy embodied in the Scenic Rivers
and Patuxent River Watershed Acts, in light of the
evidentiary rules applicable to this administrative
body, the Technical Staff, and Planning Board

could properly consider the recommendations of the Patuxent River Watershed Committee Report.

The amendment to the application did not alter the conclusions reached by the earlier recommendation of the Watershed Committee, as incorporated in the Technical Staff Report. (Ex. 95). It is apparent from the record that the general neighborhood included the nearby Patuxent River, and the adjoining proposed park area. The Council then properly accepted as material evidence the following:

That the proposed landfill abutting a natural park area is an inappropriate use and is not in conformance with the Patuxent River Watershed Act nor the Maryland Scenic Rivers Bill;

That because of noise, loss of food and habital area, wildlife, both on and off the landfill site, would be severely endangered;

That the landfill would affect the deep ravines on the proposed site, which slope down to the river, by causing destruction to both surface and ground water systems, and cause severe erosion problems;

That 'the County Department of Health concluded that no matter how well operated, most landfills will produce sediment and leachate that will not always be contained on site. The ravines on the subject property lead directly into the Patuxent River thus causing a real threat of water pollution to the Patuxent.' See *Council Decision*, p. 7, and *Technical Staff Reports*, Ex. 95.

The Council also considered the observation by the Watershed Committee that, at that time, for the past three years, many existing sanitary landfills within the Patuxent Watershed, despite foolproof design, had on a daily basis violated one

or more regulations and conditions of the permit grant.

There was sufficient evidence before the Council to determine the proposed site would adversely affect the environment of the neighboring park, including the wildlife marsh lands, and the Patuxent River.

In addition to finding that the proposed landfill would be detrimental to the general neighborhood, the Council concluded that there was no compliance with the Bowie-Collington and Vicinity Master Plan (adopted October 1970), and that adjacent property owners would have been detrimentally affected in the use and the development of their property. *Council Decision*, p. 7. The Bowie-Collington and Vicinity Master Plan (referred to in parts by all parties, the hearing examiner, the technical staff, and the Council, yet not marked as an exhibit), recommended that the land in the proposed site be used for the Patuxent River Park and low-density housing.

The Bowie-Collington and Vicinity Master Plan in addition to proposing that the area in which the landfill site was located be a permanent low-density area, states that the preservation policies attaching to this land includes the enforcement of the Patuxent River Act. See p. 12, *Bowie-Collington and Vicinity Approved Master Plan*, October 1970. In accord with the Technical Staff Report, the Council apparently found that the applicant did not demonstrate that the proposal would not violate the Master Plan intention. *Technical Staff Report*, pps. 6-10.

Finally, the Council found that there would be an adverse affect on the property values of adjoining landowners, Kidwell, Wolman, and Battner, due to noise, water and air pollution. *Council Decision*, pps. 5, 6. The Council found further that the Kidwell and Samareis land tracts would become

sandwiched between an existing County landfill site and the proposed landfill. *Council Decision,* p. 7.

There were no constitution or statutory violations and there was sufficient evidence in.support of the Decision of the District Council.

It is therefore, this 3rd day of November, 1975,

ORDERED, that the Decision of the District Council in denying Application No. 2799, be and hereby is, affirmed."

Appellants' argument in their appeal to this Court consists primarily of a repetition of their argument below, coupled with an attack on the opinion of Judge Powers. Of the six issues they have raised in their brief, we will respond only to those not answered by Judge Powers.

Their first complaint is that they were denied due process because their application was considered by the Maryland-National Capital Park and Planning Commission in spite of the fact that there is no statutory requirement [2]

---

**2.** There is ample authority for the Maryland-National Capital Park and Planning Commission involving itself in the consideration of such applications:

1) Art. 43, § 387C (b) 1. (II) — provides that the county plans for solid waste disposal systems in Prince George's County be submitted to the Maryland-National Capital Park and Planning Commission for its recommendations concerning the plan.

§ 387C (d) 4. — provides that all applicants for solid waste facility construction approval shall submit to the "approving authority" evidence to show compliance with the plan.

Although this statute does not directly require Maryland-National Capital Park and Planning Commission approval of individual applications, it shows a legislative recognition that the Commission is concerned in the proposed construction of sanitary landfills.

2) Chapter 780 of the Laws of 1959 was enacted to consolidate all previous statutes relating to the Maryland-National Capital Park and Planning Commission. Section 66 of this Act provides for local planning boards for both Montgomery and Prince George's Counties which are charged with local zoning functions, including "but ... not ... limited to ... the preparation and adoption of recommendations to the District Council with respect to zoning map amendments ...." Although special exception applications are not specifically mentioned, this section implies some authority

for such consideration. Both the report of the Technical Staff of the Commission and the Commission's Planning Board recommended disapproval of appellants' application. As may be seen by the District Council's opinion appended, the reports and recommendations of the Commission were admitted into evidence at the hearing before the zoning examiner. The record also discloses that appellants appeared and participated in those hearings. Since the report was treated as evidence along with other facts presented and opinions expressed, we fail to comprehend the source of appellants' concern. It is obviously beyond our authority to review the weight given evidence by the District Council.

to make recommendations as to those applications because of its broad language. The section concludes with the sentence:

"The county planning boards shall meet from time to time with their respective county governing bodies and shall perform such surveys, studies, and other planning duties as the governing bodies may assign them."

3) Pr. George's Co. v. Md.-Nat'l Cap., 269 Md. 202, explains the role of the Planning Commission in regard to the local county government. It was there decided that Chapter 780 is a public general law and, as such, cannot be abrogated by local ordinance.

4) Section 28.111 of the Zoning Ordinance for Prince George's County requires that:

"In connection with each application for a special exception, unless otherwise specified in these regulations, the record shall include a report by the Technical Staff of the Planning Board. Such report shall include the Staff's recommendation."

This section, which now mandates the inclusion of such reports, was effective December 2, 1974, after the date of application (May 14, 1973) and the date of the Technical Staff report (October 12, 1973) but shows that the action of the Staff and Board was in the contemplation of the District Council.

5) Judge Powers correctly pointed to Chapter 780 as authority for the action of the Technical Staff but incorrectly relied on §28.111. That section is not applicable to this particular case as it was not effective until after the appellants' application was filed and the Technical Staff report submitted.

Other similar issues raised in appellants' brief are patently frivolous; *e.g.*, they claim the Patuxent Watershed Committee's consideration of the application was unfair as there is no statutory authority for such consideration. The Committee was created in 1970 by the Planning Board. The same reasoning would apply to their participation as to that of the Technical Staff of the Planning Board. Appellant was given full opportunity at the hearing before the zoning examiner to rebut the staff and committee reports. Moreover, the examiner's recommendations were advisory only and the final decision was made by the District Council.

Judge Powers' comprehensive opinion needs supplementation only as to two additional issues. First, appellants claim that the refusal to grant the special exception was an unlawful taking of property. This contention is based on a technical staff recommendation that the land be donated to the county after the use as a sanitary landfill is complete or, alternately, that they sell it at an agreed price to the Commission. Appellants argue that the rationale of *Hoyert v. Bd. of County Comm'rs*, 262 Md. 667, is controlling. In that case, the Court of Appeals found that the action of the District Council in denying rezoning of a portion of the property requested because of anticipated condemnation proceedings was arbitrary and discriminatory. *Hoyert* is clearly inapposite. In the case at bar, there was sufficient evidence wholly unrelated to any anticipated condemnation to support the denial of the special exception. Moreover, appellants' assertion that "the Patuxent River Watershed Park Plan [is being used] as a club to drive property values down so that a property owner will not be justly reimbursed for the taking" is unsupported by any facts in the record.

Appellants also argue that the District Council's determination is invalid because it failed to define the "neighborhood" involved, citing *Malmar Associates v. Board*, 260 Md. 292, as authority. In *Malmar*, the Court of Appeals explained that the requirement of defining the general neighborhood was applicable when a special exception was *granted* and, furthermore, that the burden to define the neighborhood was on the applicant for the special exception.

In *Messenger v. Bd. of Co. Comm'rs*, 259 Md. 693, where the appellants made a similar argument as appellants in the instant case, the Court of Appeals stated:

> "This contention overlooks the basic difference between the *Montgomery* [*v. Bd. of Co. Comm'rs*, 256 Md. 597] case and the case at Bar. . . . In a case involving a *denial* by the District Council of the requested rezoning, it is only necessary for the District Council to find that the applicant had

failed to meet his burden of proof . . . ." 259 Md. at 706.

We commend the trial judge for having so clearly articulated his reasons for affirming the District Council. Our review was made much easier thereby. When the frills are trimmed from the issues raised, the circuit court, as well as this Court, was called upon to do little more than review an administrative decision and verify that appellants had received substantial justice during the deliberative period. Despite their disappointment in the final determination, the procedural rules of fair play were properly applied and substantial justice resulted.

*Judgment affirmed.*
*Costs to be paid by appellants.*

APPENDIX:

"Upon motion of Councilman Amonett, seconded by Councilman F. White, and duly passed, it was Resolved that Application No. 2799, INTERNATIONAL DISPOSAL CORPORATION OF MARYLAND, Agent, Jess Joseph Smith, Jr., Attorney, for a SPECIAL EXCEPTION to use the premises located on the northeast quadrant of Queen Anne Road and Mill Branch Road, and borders on the west side of the Patuxent River, 7th Election District, containing 268.80± acres, property zoned R-R, for the purpose of SANITARY LANDFILL, be DISAPPROVED, in accordance with the District Council's Findings of Fact and Conclusions which follow:

*FINDINGS OF FACT AND CONCLUSIONS*

### I. FINDINGS OF FACT

The subject property is located on the east side of Mill Branch Road and North of Queen Anne Road and borders on the West Side of the Patuxent River being as close as 1000 feet from it. The subject property totalling 180 acres is within one and one quarter (1-1/4) miles of the City of Bowie

(T-5-177). The elevation of the land is steep from the river upward to the subject property varying from approximately twelve (12) feet above water level at the Patuxent River up to One Hundred Sixty (160) feet at the highest point of the property (T-5-182-183) and marked by deep ravines up to sixty (60) feet in depth (T-5-179) which run directly to the Patuxent River (T-5-179) (Exhibit 241 and following). Testimony by applicant as to essential information about water tables, location of acquifers, soil composition and runoff and lechate lacked authentication, was indefinite and conflicting. At no point was so much as a test boring submitted to substantiate any testimony or exhibit submitted by applicant (T-5-208). The tract of land is approximately fifty (50) percent wooded (T-5-178) and not 'open land' as indicated in the Exhibit 194 (p. 21). Two additional physical facts are of significance: first the subject property abuts property owned by Prince George's County (181) acres formerly used for waste disposal and planned for such use in the future (T-397), (T-5-215-217) (T-413); second, the area is within the Patuxent River Watershed and the river itself has been designated a scenic river under Article 66C, Sections 759, et seq., of the Maryland Code (Now NR §§ 8-401-8-407).

The subject property was zoned R-R on comprehensive zoning map adoption basis on July 26, 1960. There is no special exception history. However as above indicated, the history and proposed use of the adjoining 181 acres owned by Prince George's County is relevant since it was used as a sludge dump by the Washington Suburban Sanitary Commission, and if it is able to meet State guidelines it could be a potential dump in the foreseeable future.

In reviewing the applicant's position of the effects of their proposed landfill on the environment, we detect a certain corporate indifference throughout their environmental assessment (Exhibit 194) and their testimony balances economic advantages of this site against the real and potential dangers to the environment, both of which they recognize (Exhibit 194, p. 17-20). The applicant's conclusion is that the economic benefits should control. The applicant's blind spot is that such legislation as the Scenic

Rivers Act and such committees as the Patuxent River Watershed Committee were authorized to make clear and protect the environment against economic expediency.

Since there was no real dispute as to the adverse environmental impact (Exhibit 194) (Testimony John Lancaster, Blaine Griffith, Park & Planning Technical Staff reports of the proposed use), the matter became one of the type and intensity of the damage. The opposition introduced the following, with which we are fully in accord:

1. Park and Planning reports recommending denial. They found it undesirable from an environmental point of view (p.p. 4, 7)* Furthermore, they found the proposal not in harmony with the purpose and intent of the General Plan and would adversely effect the health and safety or residents and would be a detriment to the use and development of adjacent properties and the general neighborhood (p. 8).

2. The Patuxent River Watershed Committee report recommended denial. After four years of study they found that landfills result in siltation, lechate, disruption and destruction of wildlife. (See Attachment to Ex. 80, Technical Staff Report).

3. 'Criteria for Sanitary Landfill Development' — an article by experts in the field substantiates the unacceptability of this site.

4. Testimony of a naturalist by profession, Blaine Griffith, indicating damage to wildlife, plant life, and the environment generally (T-302, 303, 314-315, 317).

5. Testimony by Mary Bottner, Ben Wolman, Thomas Kidwell as to the adverse effect on their personal environmental setting and property values (T-5-158-159) (T-5-120-137-138). Such effects would be noise pollution (T-5-162) (T-5-120) water supply and air pollution (T-5-167-169) (T-5-210-212).

6. Council Bill 166. This ordinance evinces two things — first an intention to re-examine the policy decisions as to

_____

*Note particularly, p.p. 5 & 6 of Supplemental Technical Staff Report (Ex. 80).

landfills general acceptability; and secondly, if they are acceptable, an evaluation should be made as to alternative sites.

7. The Availability of Alternative sites to the present one. John Lancaster, Blaine Griffith (T-314-316) Staff Report p. 6 and applicants exhibit 194 all recognize alternative sites. The only reason they were rejected was because of economic reasons.

8. Disasterous ecological effects to the environment were graphically shown through the testimony of Patuxent Watershed Committee and the accompanying slides of other landfill sites operated by applicant.

9. The testimony of John Marburger showing that the Chief Engineer at the Department of Public Works rejected the site and recommended denial of the application. Mr. Marburger's candid bias in favor of the landfill site (as opposed to his chief engineer) was explained by him as a interest the County shared with the applicant in approval because it might assist the County in putting its own adjoining landfill into operation (T-400, 405).

10. The applicants attitude toward both environmental problems vis-à-vis the Patuxent River and the residents may have slipped out inadvertently through the testimony of their expert a Mr. McCoy who, in answer to a question as to whether an opponents water supply would be effected, replied:

'If it does, you will be the first to notice it. . .'

With respect to property values testimony was presented by Kidwell, Wolman Bottner (T-5-211-212) as to the adverse effect of a landfill site on their property values. The applicant on the other hand insisted that even if the landfill polluted the Patuxent River, property values in the neighborhood would not be effected (T-589), an opinion which speaks for itself. Even more suspect than this are the 'comparables' in the report of the applicants' appraiser (Exhibit 217). There are no offsetting factors such as shopping centers, bus transportation, schools, parks, recreational facilities or the like in the Queen Anne area which are bound to weigh in whether one would buy near a

landfill site. Nor were these factors inquired into. In fact, the owners of the selected homes were not even asked if they knew they lived near a landfill site. It is also worthy of consideration that the landfill site was generally known to be closing in the near future. He did agree that having two landfill sites might adversely effect property values (T-581).

In short, the 'comparables' were not 'comparable' at all.

With a potential landfill site next door owned by the County — the argument for need of an additional one is understandably difficult for applicant to justify. Particularly in view of the applicants own testimony and evidence:

1. Their own experts rated the site second best. (T-199).

2. Their own reports and experts recognize alternative sites (Exhibit 194) (T-199) (T-400).

In addition:

3. Park & Planning Technical Staff report found alternative sites available. They also conclude protecting the environment to be a superior need. Staff report, p. 11.

4. Patuxent Watershed Committee produced a wide proposal of alternatives.

There has not been compliance with the Master Plan. The Bowie-Collington and Vicinity Master Plan, adopted October 1970, recommends the subject property for two land uses: The Patuxent River Park, and rural, low density residential development.

The specific information necessary in order to comply with the guidelines set forth in the Staff Report recommendations (guidelines 2, 6, 7, 8; p.7) was wanting at the time of that report and has not or could not be supplied, even up to the conclusion of the hearings.

Specific information on permiation, lechate and siltation was. not forthcoming from the applicant. No test borings were submitted to substantiate claims or speculations by applicants as to soil composition or water table information. No firm information as to clearing and redeveloping the land was given. Applicant continually urged approval based

on the understanding that more specific information and preventative checks would be made at the next 'phase' (Exhibit 194 p. 19-14), and assured that any potential environmental damage could be cured by a landfill 'properly operated' (T-176).

The District Council expressly adopts those several recommendations of the Technical Staff and of the Planning Board with respect to denial of this application. Among these several adopted recommendation we are particularly impressed with, and emphasize the following contained in the supplemental Technical Staff Report (Ex. 80, p.p. 5 and 6):

'1. Existing degraded areas in the County should be fully explored for their possible use as landfill sites. The use of virgin land for landfilling operations should be the very last alternative.

'2. The subject property is not included in the Preliminary Ten-Year (1974-1983) Solid Waste Management Study which has determined the need for landfilling for this period.

'3. The Scenic Rivers Bill compels harmonious and compatible land usage along the Patuxent. The use of the subject property for 15 years as a landfill operation will undoubtedly have a detrimental effect upon the scenic quality of the river and a lasting deleterious effect on wildlife and wildlife habitats.

'4. The Maryland-National Capital Park and Planning Commission in cooperation with the State has spent over $3 million of public funds on land acquisition along the Patuxent. Lands adjacent to the park area must be protected, through the zoning laws, from encroachment of incompatible and unrelated land uses.

'5. The County Department of Health states that no matter how well operated most landfills will produce sediment and leachate that will not always be contained on site. The ravines on the subject property lead directly into the Patuxent River thus causing a real threat of water pollution to the Patuxent.

'6. The Kidwell and Samaras Tracts fronting Queen Anne

Road are 'Sandwiched' between the existing County site and the proposed landfill.

'The staff recognizes the need for sanitary landfill sites within the County. However, a glance at the Solid Waste, and Sand and Gravel Maps show the number of landfill sites, and sand and gravel operations already existing along the 'scenic' Patuxent River. To continue the proliferation of this type of degradation of the river and its adjacent lands is certainly inconsistent with the public's intent of protecting the ecological balance and environment of the river.'

II. CONCLUSION:

For the aforegoing reasons and other reasons in support thereof in the record, the District Council finds that under the standards contained in Section 28.2 of the Zoning Ordinance pertaining to the grant of special exceptions: That the proposed use is not in harmony with the purpose and intent of the Zoning Ordinance; and will substantially impair the integrity of the approved master plan for this area, including the functional plan for this activity; and the proposed use would affect adversely the health and safety of residents in the area and would be detrimental to the use and/or development of adjacent properties or the general neighborhood.

Therefore, the District Council does hereby deny the application (S.E. No. 2799) for a sanitary landfill.

ENACTED by the District Council this 28th day of April, 1975.

On motion to Disapprove:

In Favor: Councilmen Francois, Amonett, Glendening, Hartlove, Koonce, F. White and Wilson
Opposed: Councilman Bogley
Absent: Councilmen Casula, McDonough and D. White
Vote: 7-1"