586 A.2d 43

**Henry Bartholomew COX, et al.**

v.

**PRINCE GEORGE'S COUNTY, Maryland, et al.**

**No. 432, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Feb. 27, 1991.

---

Phyllis M. Oetgen (Patricia A. Kaufman and Kaufman and Oetgen, on the brief), Fort Washington, for appellants.

Joyce Birkel Hope, Upper Marlboro, for appellee, Prince George's County.

Steven M. Gilbert (Zanecki, McDonough & Castelli, on the brief), Landover, for appellee, Marriott Corp.

Argued before GARRITY, ROSALYN B. BELL and CATHELL, JJ.

GARRITY, Judge.

This appeal concerns the granting of a special exception to the zoning of an 88.27 acre tract of land in Prince George's County. The special exception was approved by the District Council and that action was affirmed by the Circuit Court for Prince George's County (Salmon, J.).

The appellants are four individuals who own property which abuts or is adjacent to the land in question. They present the following issues for our review:

1. Whether the District Council adequately rendered findings of fact with respect to the standards set forth by the Prince George's County Code for a special exception.

2. Whether the record supports the Council's conclusion that the appellees met all appropriate standards.

3. Whether the District Council considered the Chesapeake Bay Critical Area Protection Program.

## Facts

The subject property is located in the Fort Washington area, and it lies on both sides of Riverview Road with about 1,800 feet of shoreline on the Potomac River. For purposes of this case, the property consists of three parcels: Parcel A, a 43.5 acre, undeveloped wooded parcel known as Tent Landing; Parcel B, a 23.6 acre tract of open land improved by a barn and poolhouse known as the Bower property; and Parcel C, a 19.9 acre parcel called the Airstrip, improved by

two residences, a hangar and an active private airstrip with an orchard along both sides of the runway.

The property was purchased by the Marriott Corporation to build a life care community for the elderly. The proposed special exception is for the development of a medical-residential campus. The residents of this proposed community, which is to be called "Falcon's Landing," are to be members of the Air Force Retired Officers Community (AFROC). The medical-residential campus is to consist of 350 dwelling units, representing a mixture of 34 dwelling units located in single-story cottages and 316 dwelling units located in four four-story buildings; a health center consisting of 52 personal-care beds and 73 long-term beds in a fifth four-story building, a dining room, a community center, and ancillary uses including a beauty/barber shop, multi-purpose room, library/reading room, coffee shop, arts and crafts space, health club as well as administrative offices and space for other services. The application for this special exception met with much resistance from the neighboring community. Consequently, this application has a lengthy procedural history.

In general, a special exception application passes through three administrative levels before reaching the District Council, with which rests the ultimate decision whether to approve the application. In chronological order, the levels are: the Technical Staff of the Prince George's County Planning Board, the Prince George's County Planning Board, and the Office of the Zoning Hearing Examiner. The Staff is required to make a report and recommendation for the record on each application for special exception. *Zoning Ordinance of Prince George's County*, § 27–311. The Planning Board is responsible for deciding whether to adopt the Staff's recommendations and forwarding them to the District Council. Prior to the Council's making a decision, the Hearing Examiner must hold a public hearing. *Zoning Ordinance, supra*, §§ 27–126 to 27–130, § 27–313. The Examiner must file then with the District Council a written decision containing specific findings of basic facts,

conclusions of law, and a recommended disposition of the case. *Zoning Ordinance, supra,* § 27–127(c).

In the case at hand, the Technical Staff initially recommended denying the application for the medical-residential campus special exception. This recommendation was based on the Staff's conclusion that the plan was not in harmony with the purpose of the zoning ordinance, that it would prove detrimental to the use and development of adjacent properties and that it did not comply with applicable regulations. The Staff relied upon these facts in reaching its conclusions: the failure to establish architectural integration; the inadequacy of the existing road capacity; noncompliance with design standards and parking and loading space requirements; noncompliance with the Chesapeake Bay Critical Area Program; and density disparity between the planned use and neighboring properties. Adopting the Staff's analysis and recommendation, the Planning Commission denied the application.

During three days of hearings, the parties presented testimony to the Zoning Hearing Examiner, who advised remanding the application to the Planning Commission for a revised site plan incorporating certain recommendations. These included that no buildings be erected in the Resource Conservation Overlay (R–C–O) [1] portions of the property, no dwellings over three stories in height, an overall density of dwelling units no higher than permitted for clusters in the R–80 zone,[2] at least a 150 foot wide buffer on the north side of the property, no retail sales or services on the site, no recreational vehicle storage on the airstrip portion and computation of employee parking needs. In its conditional grant of the special exception, the District Council relied

---

**1.** The Resource Conversation Overlay zone is one of three zones superimposed over existing zones by the Chesapeake Bay Critical Area Overlay Zones. *Zoning Ordinance,* § 27–548.15. Overlay zones are used to place property simultaneously in two zones. D. Hagman, *Urban Planning and Land Development Law,* § 4.14 (1986).

**2.** The density level in the R–80 cluster zone is 4.10 dwelling units per acre.

almost exclusively on the Examiner's written decision. With the exception of the three-story height limitation,[3] the conditions imposed by the Council responded to the Examiner's recommendations.

## I.

■ In Prince George's County, no contested application for special exception may be granted or denied except upon written findings of basic facts and written conclusions. Md.Ann.Code. art. 28, § 8–123 (1990); *Zoning Ordinance, supra,* § 27–141. The appellants contend that the District Council's written decision falls short of this requirement. This decision must be tested in light of *Zoning Ordinance,* §§ 27–317 [4] and 27–374, for therein lie the basic facts and conclusions the Council must express.[5] *Entzian v. Prince*

---

3. The Council concluded that lowering the height of the main building from four to three stories would not improve views of the Potomac River from Riverview Road. Consequently, the Council approved the four-story height. *See* Appendix.

4.                       Subdivision 9.
                 Special Exception Approval.
Sec. 27–317. Required findings.
    (a) A Special Exception may be approved if:
    (1) The proposed use and site plan are in harmony with the purpose of this Subtitle;
    (2) The proposed use is in conformance with all the applicable requirements and regulations of this Subtitle;
    (3) The proposed use will not substantially impair the integrity of any validly approved Master Plan or Functional Master Plan, or, in the absence of a Master Plan or Functional Master Plan, the General Plan;
    (4) The proposed use will not adversely affect the health, safety, or welfare of residents or workers in the area; and
    (5) The proposed use will not be detrimental to the use or development of adjacent properties or the general neighborhood.

5. In pertinent part, this ordinance reads:
Sec. 27–374. Medical/residential campus.
    (a) A medical/residential campus for retirement-aged persons may be permitted, subject to the following:
    (1) General requirements
    (A) The campus shall primarily serve needs of the retirement-aged community. At least one (1) resident of each household shall

*George's County*, 32 Md.App. 256, 261, 360 A.2d 6 (1976); *cf. Ocean Hideaway Condo. v. Boardwalk Plaza*, 68 Md. App. 650, 655–656, 515 A.2d 485 (1986); *Heller v. Prince George's County*, 264 Md. 410, 412–413, 286 A.2d 772 (1972).

Specifically, appellants contend that neither the District Council nor the Hearing Examiner made factual findings regarding impairment of the Master Plan, compatibility with the neighborhood, road capacity, and functional integration. We do not agree.

In *Turner v. Hammond*, 270 Md. 41, 310 A.2d 543 (1973), the Court expressed disapproval of the Board of Zoning Appeals' use of a preprinted form when it wrote "the 'reasons' given by the Board for denying the application suggest a rather cavalier attitude in respect of its duties and responsibilities. It made no findings of fact worthy of the name and we think citizens are entitled to something more than a boiler plate resolution." (Citation omitted);

---

be at least fifty (50) years old, unless the applicant can demonstrate that a lesser minimum age requirement should be approved;

(B) The campus shall achieve a balanced residential/medical environment which is unique to the neighborhood in which it is located, and which cannot be achieved through the use of conventional zoning proposals;

(C) Residences shall be functionally, physically, and architecturally integrated with service and recreational/activity centers;

(D) Medial services (if any) shall be conveniently located for the residents; and

(E) Commercial or service-oriented uses shall be grouped together, and shall be located near the population being served.

(2) Special Requirements

(A) The subject property shall contain at least twenty-five (25) contiguous acres;

(B) The site shall have frontage on, and direct vehicular access to, an existing street with sufficient capacity to accommodate any traffic generated by the campus;

(C) All buildings, structures, off-street parking compounds, and loading areas shall be located at least:

(i) One hundred (100) feet from any adjoining land in a Residential Zone, or land proposed to be used for residential purposes on an approved Basic Plan for a Comprehensive Design Zone, approved Official Plan for an R–P–C Zone, or any approved Conceptual or Detailed Site Plan;

*accord Pistoria v. Zoning Board,* 268 Md. 558, 302 A.2d 614 (1973). In *Ocean Hideaway Condo. v. Boardwalk Plaza,* 68 Md.App. 650, 515 A.2d 485 (1986), the Board addressed the required standards but made no factual findings whatsoever. The Board's nine single sentence conclusion merely parroted the conditions precedent to granting the special exception at issue. We disapproved of the perfunctory disposition which the Board had made. In the case at hand, unlike *Turner, Pistoria,* and *Ocean Hideaway, supra,* the reasons given by the Council are not mere boiler-plate or conclusory statements. While the findings may not be as detailed or comprehensive as appellants would like, there is no requirement that the Council or Examiner set out in their findings of fact a discussion of all the evidence. *Ocean Hideaway,* 68 Md.App. at 660, 515 A.2d 485.

## II.

■ Appellants contend that the District Council erred in finding that the special exception complied with the applicable zoning ordinance. When reviewing an administrative decision, a court must determine whether the question before the agency was fairly debatable, which has been defined as whether the agency's "determination involved testimony from which a reasonable man could come to different conclusions." *Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080 (1979) (quoting *Eger v. Stone,* 253 Md. 533, 253 A.2d 372 (1969)); *Board v. Oak Hills Farms,* 232 Md. 274, 192 A.2d 761 (1963) (whether reasoning mind could reasonably reach result agency reached upon review of picture painted by entire record). If the issue is fairly debatable, as shown by the record, the Council's decision will be affirmed. *Prince George's County v. Meininger,* 264 Md. 148, 152, 285 A.2d 649 (1972); *see also, Warner v. Town of Ocean City,* 81 Md.App. 176, 567 A.2d 160 (1989) (no matter how conflicting the evidence or questionable the credibility, court cannot substitute its judgment). This test applies to applications for a special excep-

tion. *Zengerle v. Bd. of Co. Comm'rs.*, 262 Md. 1, 17, 276 A.2d 646 (1971). Since administrative agency decisions are *prima facie* correct and carry a presumption of validity, we must review the Council's decision in the light most favorable to the Council. *Terranova v. Board*, 81 Md.App. 1, 9, 566 A.2d 497 (1989). Our role is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review. *Mortimer v. Howard Research*, 83 Md.App. 432, 575 A.2d 750 (1990).

Appellants maintain that the Falcon's Landing special exception impairs the integrity of the Master Plan, adversely affects the health, safety and welfare of the residents and workers in the area, is detrimental to the use and development of neighboring properties, and is not integrated, in contravention of § 27–317(a)(3), (4) and (5) and § 27–374(a)(2)(C) *Zoning Ordinance.* In support of their argument appellants rely primarily on increased density and traffic volume.

When we examine the record in the matter *sub judice,* we find sufficient evidence by which a reasoning mind could conclude that the proposed Falcon's Landing facility met the special exception and medical-residential campus requirements. A brief summation of that evidence elucidates this conclusion.

Bruce Yoder, an expert in land use planning, testified that the community met the Master Plan goals of scenic asset preservation; development which minimizes noise, vibration, fumes and visual intrusions; creative site planning; environmental protection; and ensuring the continued availability of housing. Further evidence revealed that although the proposed development would result in an unacceptable traffic impact at the intersection of Fort Washington and Riverview Roads, the installation of a traffic signal would elevate conditions to a superior level of

service.[6] There was substantial testimony that neither the use nor the value of neighboring properties would be adversely affected by Falcon's Landing. Indeed, comparative studies supported this conclusion.

Appellants also contend that because the Falcon's Landing site plan does not contain additional sidewalks, as recommended by the Technical Staff, it is not functionally, physically and architecturally integrated as required by *Zoning Ordinance,* § 27–374(a)(1)(C). The testimony revealed that the proposed community met the integration requirements despite the absence of the additional sidewalks. The evidence adduced indicated, *inter alia,* that the buildings would be constructed of similar materials and share similar architectural features, that there would be extensive screening landscaping and that there would be a linkage of jogging and walking trails. We hold that a reasoning mind could reasonably have accepted this evidence as sufficient to support granting the special exception.

Finally, the District Council, via its adoption of the hearing examiner's decision, properly regarded the elevated density level as a discretionary matter since *Zoning Ordinance,* § 27–374(a)(2)(F), specifically exempts medical-residential campuses from the density constraints. We turn now to the interplay between § 27–374, *supra,* and the Chesapeake Bay Critical Area Protection Program where we discuss in greater detail the density issue.

### III.

### A.

The Chesapeake Bay is the nation's largest estuary and one of Maryland's most valuable resources. In addition to

---

6. Installation of a traffic signal would raise the level of service to an "A" level from an unacceptable "F" level. The District Council granted this special exception conditioned on the installation of the traffic signal.

providing a wildlife habitat of national importance, the Bay is a rich economic and recreational asset. The effects of various activities have resulted in a decline in the living resources of the Bay. Concerned that the increasing population and continued development of the Bay area would cause even more damage to this resource, the General Assembly has enacted protective legislation in many areas.[7] The Chesapeake Bay Critical Area Protection Program [8] is one scion of the concern about the Bay.

Enacted in 1986, the goal of the Critical Area Program is to protect the Bay and its tributaries by fostering more sensitive development in shoreline areas. Md.Nat.Res.Code Ann. § 8–1801(b)(1). The legislature designed the Critical Area Program to be implemented on a cooperative basis between the State and affected local governments. Under this Program, local governments establish their programs in a consistent, uniform manner subject to State criteria and oversight. Md.Nat.Res.Code Ann. §§ 8–1801(b)(2), 8–1808.

The Critical Area Program creates a Chesapeake Bay Critical Area Commission that is charged with the development of criteria that will accommodate growth while conserving and protecting critical areas resources. Md.Nat. Res.Code Ann. § 8–1806, Md.Regs.Code Independent Agencies, §§ 14.15.01—14.15.10 (1986). The Commission is responsible for reviewing proposed local programs for compliance with the standards and criteria of the State program.

A portion of the Chesapeake Bay Critical Area is located within the territorial limits of Prince George's County. In accordance with the Critical Area statute, the County developed its local program which the Commission approved on October 21, 1987. We turn now to the issue presented by appellants.

---

7. Maryland General Assembly, Department of Legislative Reference, *1987–1990 Major Issues Review*, N–1.

8. *Id.*

## B.

■ In the matter *sub judice,* a 23.7 acre portion of Parcel A is zoned Rural Residential (R–R) and Limited Development Overlay (L–D–O) which creates a potential density range of 1.85 to 4.0 dwelling units per acre (du/a). The thrust of appellants' argument is that the Chesapeake Bay Critical Area Program imposes a threshold density requirement on all development, including that accomplished by special exception.

More specifically, appellants assert that there is a conflict between the Critical Area Program and the medical-residential campus density waiver. Relying on *Farmers & Merchants Bank v. Schlossberg,* 306 Md. 48, 507 A.2d 172 (1986), appellants posit that, assuming an irreconcilable conflict, the more recently enacted Critical Area Program repeals by implication the conflicting density provision of the earlier medical-residential campus special exception. Accordingly, appellants contend that the 4.10 du/a density adopted by the District Council for the special exception at hand is in derogation of the Chesapeake Bay Critical Area Program and thus must be reversed. We disagree.

## C.

■ The cardinal rule of statutory construction is to ascertain and effectuate the intention of the Legislature. *Soper v. Montgomery County,* 294 Md. 331, 449 A.2d 1158 (1982). In this case, we are charged with ascertaining the intention of the Prince George's County District Council and the Chesapeake Bay Critical Area Commission. *Prince George's County v. Equitable Trust Co., Inc.,* 44 Md.App. 272, 408 A.2d 737 (1979) (ordinances and statutes are construed under same basic canons).

The conflict at hand requires us to reconcile three components of the Prince George's County Critical Area Program—L–D–O zone, R–R zone, and the medical-residential campus special exception.

In developing its Critical Area Program, Prince George's County relied on the overlay zone concept which has been described as "a mapped overlay district superimposed on one or more established zoning districts and may be used to impose supplemental restrictions on uses in these districts, permit uses otherwise disallowed, or implement some form of density bonus or incentive zoning program." 1 Ziegler, *Rathkopf's The Law of Zoning and Planning*, 4th Ed. (1990). The County established three critical area overlay zones: Intense Development Overlay (I–D–O), Limited Development Overlay (L–D–O), and Resource Conservation Overlay (R–C–O). The overlay zone at issue is the L–D–O zone,[9] the purposes of which are to maintain or improve the

---

**9.** a. To qualify for L–D–O classification, the area must have at least one of four features:

(1) Housing density ranging from one dwelling unit per five acres up to four dwelling units per acre;

(2) Areas not dominated by agriculture, wetland, forest, barren land, surface water, or open space;

(3) Areas meeting the conditions of Regulation .03A, but not .03B [see *infra* note 9b.];

(4) Areas having public sewer or public water, or both.

Md.Regs.Code Independent Agencies, § 14.15.02.04 (1986).

In designating the property as L–D–O, the Maryland National Capital Park and Planning Commission (M–NCPPC) noted that the density of the existing subdivision and recorded subdivision was consistent with the L–D–O density feature and the property was serviced by public water and sewer. M–NCPPC, Chesapeake Bay Critical Area Overlay Zones, Zoning Map Amendment, March 1988.

b. Md.Regs.Code Independent Agencies, § 14.15.03 (1986) provides in pertinent part:

**.03 Intensely Developed Areas.**

A. Intensely Developed Areas are those areas where residential, commercial, institutional, and/or industrial, developed land uses predominate, and where relatively little nature habitat occurs. These areas shall have at least one of the following features:

(1) Housing density equal to or greater than four dwelling units per acre;

(2) Industrial, institutional, or commercial uses are concentrated in the area; or

(3) Public sewer and water collection and distribution systems are currently serving the area and housing density is greater than three dwelling units per acre.

B. In addition, these features shall be concentrated in an area of at least 20 adjacent acres, or that entire upland portion of the

quality of runoff and groundwater entering Bay tributaries, maintain existing areas of natural habitat and accommodate additional low or moderate intensity development in accordance with the conservation manual.[10] *Zoning Ordinance,* § 27–549.14. Md.Regs.Code Independent Agencies, § 14.15.02.04B (1986). The L–D–O zone places on new development regulations in addition to those of the underlying zone. In the L–D–O zone, the additional regulations provide, *inter alia,* a maximum impervious surface ratio of 15 percent, no development on slopes greater than 15 percent and a 4.0 du/a density provided, however, that the density does not exceed that of the underlying zone. *Zoning Ordinance,* §§ 27–548.16(c)(1), 27–548.17. The underlying zone in this case is the Residential Rural (R–R) zone which accommodates a 1.85 du/a density.

In support of their argument that the proposed development violates the density strictures of the L–D–O and R–R zones, appellants rely upon language in Zoning Ordinance § 27–548.14 outlined above and upon language in the Planning Commission's map amendment transmittal[11] that whenever there is a conflict between overlay regulations and underlying regulations, the more restrictive shall apply. This language, however, is inapposite since a special exception by definition is a use that would not be appropriate

---

Critical Area within the boundary of a municipality, whichever is less.

**10.** The purpose of The Prince George's County Conservation Manual is to assure sound land management and environmental protection. The Manual details the components of a conservation plan, a prerequisite to all development or improvement of property located within the Chesapeake Bay Critical Areas. In broad terms, the components of the plan include site inventory, buffer delineation, habitat protection, vegetation protection, stormwater management, soil erosion, and mitigation measures. *Conservation Manual,* 1987. In this case, the Prince George's County Planning Board approved appellee's conservation plan, and, thereafter, entered into a formal conservation agreement with appellee.

**11.** The Maryland–National Capital Park and Planning Commission, *Chesapeake Bay Critical Area Overlay Zones, Zoning Map Amendment, Transmittal,* July 1988.

generally or without restriction and is granted upon findings that certain conditions governing special exceptions as detailed in the zoning ordinance exist; that the use conforms to the plan; and that the use is compatible with the existing neighborhood. Md.Code Ann. Art. 66B, § 1.00 (1988). Appellants' argument fails because it tries to impose regulations binding development of the underlying R–R zone on a special exception.

In table format, *Zoning Ordinance*, § 27–441(b), lists the uses permitted in each of the various underlying residential zones, including the R–R zone. One of the permitted uses in the R–R zone is the medical-residential special exception. Density, however, is not one of the restrictive conditions applicable to medical-residential campuses.

*Zoning Ordinance*, § 27–548.16(a) provides that "[u]ses allowed in the Chesapeake Bay Critical Area Overlay Zones are the same as those allowed in the underlying zones, except as modified in the Table of Uses in Subsection (c)."

(c)  TABLE OF USES [12]

| USE | R–C–O | L–D–O | I–D–O |
|---|---|---|---|
| (1)  COMMERCIAL: | | | |
| Commercial uses, in general | X | PC | PC |
| Fisheries activities | PC | PC | PC |
| Marinas | X | SE | SE |
| Expansion of existing marinas | X | SE | SE |
| Asphalt mixing plant | X | X | X |
| Concrete batching or mixing plant | X | X | X |
| (2)  INDUSTRIAL: | | | |
| Industrial uses, in general | X | X | PC |
| (3)  RECREATIONAL/EDUCATIONAL: | | | |
| Community piers and noncommercial boat docking and storage | X | SE | SE |

---

**12.** *Zoning Ordinance.* § 27–548.16(b), defines the following symbols:

X  —  the use is prohibited;

P  —  the use is permitted;

PC  —  the use is permitted subject to certain delineated criteria;

SE  —  the use is permitted subject to the approval of a Special Exception.

| USE | ZONE R-C-O | L-D-O | I-D-O |
|---|---|---|---|
| Public beaches and public water-oriented recreational and educational areas | PC | PC | PC |
| Water-dependent research facilities or activities operated by State, federal, or local agencies, or educational institutions | PC | PC | PC |
| (4) TRANSPORTATION/PARKING/COMMUNICATIONS/UTILITIES: | | | |
| Transportation facilities | X | X | P |
| Utility transmission facilities | X | X | P |

*Zoning Ordinance,* § 27–548.16(c) (footnotes omitted).

As may be seen, the table specifically excludes from the overlay zones some of the uses previously allowed under *Zoning Ordinance,* § 27–441(b). The table alters other uses. The table, however, is void of any reference to the medical-residential campus special exception which is allowed under the R–R zone. Consequently, the provisions of the medical-residential campus, *Zoning Ordinance,* § 27–374, remain intact including the following:

> (F) Regulations concerning the height of structure, lot size and coverage, frontage, setbacks, *density,* and other requirements of the specific zone in which such campus is to be located, *shall not apply* to uses and structures provided for in this Section. The dimensions and percentages shown on the approved site plan shall constitute the regulations for development under a given Special Exception.

*Zoning Ordinance,* § 27–374(F) (emphasis added).

■ Our conclusion is further supported by the *expressio unius est exclusio alterius* principal of construction. Under this maxim, if a statute or ordinance, as here, specifies particular uses subject to modification, unlisted uses are excluded from modification. In *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Gartelman,* 288 Md. 151, 416 A.2d 734 (1980), the Court applied this maxim and held that when the

Legislature has expressly enumerated certain exclusions, others should not be inserted. *Accord Ferrero Const. Co. v. Dennis Rourke Corp.*, 311 Md. 560, 536 A.2d 1137 (1988). As *Zoning Ordinance*, § 27–548.16 listed the uses that were altered by the Critical Areas Program, we must conclude that the density modification urged upon us by appellant was excluded since the ordinance was silent regarding this use.

The Legislature, furthermore, is presumed to have had and acted with full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of prior law. *Barter Systems, Inc. v. Rosner*, 64 Md.App. 255, 494 A.2d 964 (1985). Accordingly, the District Council and the Critical Area Commission are presumed to have known of the density waiver applicable to medical-residential campuses when they approved the Prince George's County Critical Area Program. This leads us to believe that they intended this special exception and its provisions to remain viable. This construction results in no clause of the ordinances and regulations being deemed superfluous, void or insignificant. *Erwin & Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 498 A.2d 1188 (1955); *Williams v. William T. Burnett & Co.*, 296 Md. 214, 462 A.2d 66 (1983); N. Singer, Sutherland *Statutory Construction*, § 75.07 (4th ed. 1990).

While the Critical Areas Program requires a special exception for a medical-residential campus to comply with the provisions of the Conservation Manual, we reiterate that it does not alter the density waiver provision of *Zoning Ordinance*, § 27–374. To hold that the density limitations of the L–D–O zone apply to the campus would be to usurp the authority of the Prince George's County District Council and the Critical Area Commission, and to eviscerate the time-honored presumption of validity and correctness in which the special exception shares. *Schultz v. Pritts*, 291 Md. 1, 14, 432 A.2d 1319 (1981) (quoting *Anderson v. Sawyer*, 23 Md.App. 612, 617–618, 329 A.2d 716 (1974)).

JUDGMENT AFFIRMED; APPELLANTS TO PAY COSTS.