EGER, ET AL. *v.* STONE, ET AL.

[No. 214, September Term, 1968.]

*Decided May 15, 1969.*

534

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*C. Edward Nicholson* for appellants.

*Carl Lee Frederick, Jr.,* and *E. Austin Carlin* with whom were *Meatyard, Carlin, Hollis & Foster* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal involves the single question of whether or not there was sufficient evidence before the Board of Appeals of

Montgomery County (Board) to make fairly debatable its denial of the application of the appellees, John P. Stone, et al, for a special exception originally for the off-street parking of 823 motor vehicles, but later amended during the course of the hearings for parking of 626 motor vehicles, on approximately 9.5 acres of their land, zoned R-R (Rural-Residential), and located on the north side of River Road approximately 50 feet west of the intersection of that road with Seven Locks Road, Potomac, in Montgomery County. The Board denied the special exception on November 7, 1967, but the Circuit Court for Montgomery County (Shure, J.), on appeal from the Board, passed an order on July 15, 1968, reversing that action by the Board and remanding the case to the Board with directions to grant the application and impose conditions in regard to ingress and egress, screening and landscaping. The appellants, who had protested the granting of the special exception before the Board, entered a timely appeal to this Court from the order of the Circuit Court. In our opinion, the Circuit Court erred in reversing the Board and we will accordingly reverse the order of July 15, 1968.

The section or portions of the Montgomery County Zoning Ordinance are of particular relevance in this case, and appear in the Montgomery County Code of 1965, as amended, as follows:

"Section 111-35. SAME—PREREQUISITES TO GRANTING

"a. A special exception may be granted when the board or the director, as the case may be, finds from a preponderance of the evidence produced at the hearing that:

(1) The proposed use does not affect adversely the general plan for the physical development of the district, as embodied in this chapter *and in any master plan or portion thereof* adopted by the commission.

(2) The proposed use will *not affect adversely the health and safety of residents or workers* in the area and will not be detrimental to the use or development of adjacent properties or the general neighborhood.

(3) The standards set forth for each particular use for which a special exception may be granted have been met."

Amendment of November 1, 1966:

"a (4) With respect to uses of a commercial or professional nature other than home occupations, a clear and present need exists in the general neighborhood for the proposed use at the time of the application; in determining the existence of such need, the Board shall consider the availability of land, space, and facilities in the general neighborhood where the proposed use is a present use at the time of the application.

"b. The *applicant for a special exception shall have the burden of proof,* which shall include the burden of going forward with the evidence and the burden of persuasion *on all questions of fact which are to be determined by the board or the director.* (Emphasis supplied)

"Section 111-37. Same—*Uses which may be permitted; standards and requirements for specific uses.*
\* \* \*

"*Off-street parking of motor vehicles in connection with commercial or industrial uses.*

"In any residential (R-A, R-R, R-90, R-60, R-40, R-30, R-20, R-10) or C-O Zone, on land not reserved for street or highway purposes, the off-street parking of motor vehicles in connection with commercial or industrial uses, upon a finding by the board that said use *will not constitute a nuisance because of traffic, noise or physical activity,* provided, that the applicable provisions of Section 111-27, of this Code, particularly subsection (d) thereof, and the following requirements are complied with:

(1) No charge shall be made for the use of said parking facility for the first hour.

(2) No service of any kind shall be extended to persons occupying vehicles in said parking space, nor shall such space be used for automobile service, re-

pair or storage, except storage of new cars by new car dealers; provided, that in the case of storage of new cars by new car dealers, the land used for such purpose shall be adjacent to, or separated only by a street from, land in the C-2 zone. The board shall have the authority to limit the number of new cars to be stored pursuant to this subsection." (Emphasis supplied)

The Board had five hearings on the application, i.e., on December 22, 1966, January 26, February 23, May 4 and June 15, 1967. Much testimony was produced by the applicant at these hearings, which included the testimony of several well-recognized and well-regarded experts. Without giving an exhaustive summary of this testimony, it was to the following effect: The tract of land of approximately 9.5 acres for which the special exception was originally requested for off-street parking surrounded approximately 4.5 acres of land zoned C-1 (local commercial), also owned by the applicants. The applicants intended to erect a local shopping center on approximately 100,000 square feet (approximately 2.1 acres) of the C-1 zoned land and intended to use the balance of the C-1 land as well as much of the 9.5 acres of R-R zoned land for parking for the proposed shopping center. After the filing of the application but prior to its denial by the Board on November 7, 1967, the Montgomery County Council rezoned 2.47 acres of the C-1 zoned land to R-R. The applicants then amended their original application to reduce the number of parking spaces from 823 to 626. The architect for the applicants testified that the building for the shopping center would occupy 75,000 square feet of the 2.1 acres of the remaining C-1 zoned land and that the building would provide 92,600 square feet of rental area on two levels.

The other experts who testified for the applicants gave their opinions and the facts upon which these opinions were based, to the effect that the erection of the proposed shopping center and off-street parking spaces would not, even under existing traffic conditions, create a traffic hazard; would not be subject to occasional flooding because of the proposed erection of an adequate storm drainage system by the applicants on their land in

order to carry excess surface water below and south of River Road into Cabin John Creek; that there was no conflict between the proposal and the Cabin John Master Plan adopted in 1957, pointing out that the Master Plan indicated that the site at the intersection of Seven Locks Road and River Road was chosen for a local shopping center; and, that the proposed use would not, in their opinion, adversely affect the General Plan for the development of the District, and would not be detrimental to the use or development of adjacent properties or the general neighborhood.

The protestants, however, introduced the evidence of A. Morton Thomas, a well-qualified land planner, civil engineer and land surveyor, who had testified previously before both the Board and the Montgomery County Council as an expert land planning consultant, who testified that, in his opinion, the erection of the proposed shopping center would create a traffic hazard at "a clogged and very hazardous intersection" and would thus adversely affect the safety of persons in the area. He had made a traffic analysis by stationing himself at the intersection in question and gave the Board his observations in regard to the traffic situation there. He pointed out the two roads in question were old, narrow roads, approximately 20 feet in width and accommodating two lanes of traffic. He observed that in the days of the "old Model Ts" which were driven approximately 25 to 30 miles per hour there would be an adequate sight distance at the intersection but at the present time under modern traffic conditions the sight distance was not adequate and presented facts supporting his opinion. Mr. Thomas further pointed out that as of the last day of the public hearings, no final decision had been made by Montgomery County in regard to the re-alignment of Seven Locks Road and how any re-alignment would affect the subject property; he also stated that no date had been established by the State Roads Commission for the improvement of River Road. Mr. Thomas' testimony in this regard was partially supported by evidence given by one of the experts produced by the applicants who stated that no grades had been established for either road, nor had either road been programmed; that the situation was not "an ideal situation"; that he knew of no other comparable intersection and that he

agreed with Mr. Thomas that the sight distance condition on Seven Locks Road was a problem. Another expert presented by the applicants stated: "One of the problems now is the Seven Locks Road intersection is so close to the Capital Beltway interchange as to create problems, turning problems", and further that the reconstruction of River Road was for "sometime after 1970" and that Seven Locks Road could not be rehabilitated to meet modern traffic standards without being relocated.

Mr. Thomas also testified that, in his opinion, the granting of the special exception would be adverse to the Master Plan. The Master Plan in section "g"—"C-1 Zone", provides as follows:

> "Following the pattern already established in the developed section of the Regional District, several sites were chosen for local shopping centers. These are located at the intersection of Seven Locks Road and Tuckerman Lane; Seven Locks Road and River Road; and on the north side of MacArthur Boulevard between Seven Locks Road and 79th Street. In general, *these local shopping centers have a trading area of a radius of one mile which would not conflict with other established or proposed local shopping centers.* These proposed sites also were located at the junction of important highways crossing the area both north and south and east and west. Particular attention was given to locations that would not unduly affect surrounding residential development." (Emphasis supplied)

The expert land planner for the applicants testified that the one-mile trading radius mentioned in the Master Plan would serve 3100 persons. He "expanded the area to a 5 minute driving distance outward in all directions from the subject site and arrived at a population projection or figure of 12,800 persons residing in that area." He further stated that a "five minute radius" would in miles be between two to five miles "depending on the type of highway you are on." He admitted on cross-examination that there had been no increase in the density provided for on the Master Plan and, further, that all development had been in accordance with the Master Plan. He also

stated that he had based his conclusions on the larger figure of 12,800 within the five minute drive of the subject property, although the Master Plan did not provide for a five minute drive.

Mr. Thomas, as we have indicated, was of the opinion that the granting of the special exception would be adverse to the Master Plan. In support of that opinion he pointed out that in the Master Plan the site in question was designed for a local shopping center with a radius between two and five miles which would be a far larger shopping center than the one contemplated by the Master Plan and would take in areas already served by four other shopping centers. He was also of the opinion that the commercially zoned area on the Master Plan for the local shopping center was intended to accommodate *all off-street parking*. It follows from this opinion, of course, that the proposed use of additional acreage of land zoned R-R would permit the applicants to use the commercially zoned land fully for retail sales purposes and thus expand the proposed use as a local shopping center beyond the type of use contemplated by the Master Plan.

The protestants also produced a lay witness, Mrs. Irma Raker, who lived in the immediate area and who was protesting the granting of the application. She testified that she had made an investigation of the frequency of accidents on River Road. She submitted to the Board a detailed list of accidents which occurred in the immediate vicinity of the River Road-Seven Locks Road intersection during 1966 and through a part of 1967. The Board admitted her statistics into the record, over objection of counsel for the applicants. Mrs. Raker's list indicated that during the period there were 25 accidents, including one fatality during 1966. One accident in 1967 involved the husband of the witness. Ten of the accidents occurred between 9:00 A.M. and 5:00 P.M., the usual shopping hours. Seventeen persons were injured, and, as indicated, one was killed, as a result of the twenty-five accidents. The list of accidents during the period mentioned, which included the exact date and time, the day of the week, the location and the number of persons killed or injured, was accompanied by a diagram of the intersection (admitted as an additional exhibit) showing vividly the various

"slow", "truck crossing", "S-curve" and "do not pass" signs on River Road in front of the subject property.

The Board, by a three to one vote, disapproved the application for the special exception on November 7, 1967, the opinion of the Board providing in relevant part, as follows:

> "In order for the Board to grant an off-street parking Special Exception, the Board is required to find that the use will not constitute a nuisance because of traffic, noise or physical activity; that the proposed use will not affect adversely the General Plan for the physical development of the district as embodied in the Ordinance and in any Master Plan or portion thereof adopted by the Commission; that the proposed use will not affect adversely the health and safety of residents or workers in the area and will not be detrimental to the use or development of adjacent properties or the general neighborhood.
>
> "From the testimony and evidence of record the Board finds that an existing dangerous situation with regard to traffic and drainage would be worsened by the approval of the requested Special Exception. Until such time as River Road is changed in grade and Seven Locks Road is relocated, the introduction of a large parking area and increased traffic at the subject site would constitute a hazard to persons residing in the areas and those utilizing the services of the proposed shopping center. In addition, the Board finds that the approval of the proposed use would result in a shopping center larger in scope than the local shopping center provided for at this site in the existing Master Plan for the area."

On appeal to the Circuit Court, Judge Shure, after hearing the arguments of counsel, filed a comprehensive written opinion in which he reviewed the testimony of substantially all of the witnesses and considered—erroneously we think—that there was insufficient evidence to support the refusal of the special exception by the Board so that the action of the Board was legally arbitrary and capricious and therefore illegal and void.

In our opinion, the testimony of Mr. Thomas, confirmed in part by testimony elicited on cross-examination of the experts of the applicants as well as the testimony of Mrs. Raker constituted sufficient evidence to make the matters before the Board "fairly debatable" so that its decision denying the application for the special exception was not arbitrary and capricious and the decision of the Board could not be successfully challenged in court. We have made it quite clear that if the issue before the administrative body is "fairly debatable", that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body, in the absence of an unconstitutional taking of private property for public use without the payment of just compensation. *Brouillett v. Eudowood Shopping Plaza, Inc.,* 249 Md. 606, 241 A. 2d 404 (1968); *Creative Country Day School, Inc. v. Montgomery County Board of Appeals,* 242 Md. 552, 219 A. 2d 789 (1966); *County Council for Montgomery County v. Gendleman,* 227 Md. 491, 177 A. 2d 687 (1962).

This rule will be adhered to even if we were of the opinion that the administrative body came to a conclusion we probably would not have reached on the evidence. In the instant case, but for the rule, we might well have reached the conclusion reached by the learned lower court, but in enforcing the rule we are obliged to say that reasonable persons could have reached a different conclusion on the evidence so that the issues were fairly debatable, and hence, the decision of the Board must be sustained.

The lower court, in our opinion, unduly summarized Mr. Thomas' testimony and, in effect, disregarded Mrs. Raker's testimony on the ground that it was "hearsay". We have recently decided, however, that not only is hearsay evidence admissible in administrative hearings in contested cases but that such evidence, if credible and of sufficient probative force, may indeed be the sole basis for the decision of the administrative body. *Neuman v. Mayor and City Council of Baltimore,* 251 Md. 92, 246 A. 2d 583 (1968) (decided subsequent to the lower court's decision in the instant case). In our opinion the testimony of Mrs. Raker was clearly admissible in evidence and

was of sufficient credibility and probative force to support, at least, Mr. Thomas' opinion that a traffic hazard would arise as a result of the granting of the special exception.

*Order of July 15, 1968 of the Circuit Court for Montgomery County reversed and the decision and order of the Board of Appeals of Montgomery County of November 7, 1967 reinstated, the appellees to pay the costs.*