892 A.2d 579

Charles COLAO

v.

The MARYLAND–NATIONAL CAPITAL PARK
AND PLANNING COMMISSION et al.

No. 2596, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Dec. 6, 2005.

Reconsideration Denied March 15, 2006.

G. Macy Nelson, Towson, for appellant.

Andre Green, Upper Marlboro, Thomas H. Haller, Lanham, for appellee.

Panel HOLLANDER MOYLAN, CHARLES E., JR. (retired, specially assigned) THIEME, RAYMOND G., JR. (retired, specially assigned), JJ.

MOYLAN, J.

On October 9, 2003, the Prince George's County Planning Board of the Maryland–National Capital Park and Planning Commission ("the Planning Board") approved a Preliminary Plan of Subdivision for an 86–lot cluster subdivision, along with a variation from the Subdivision Regulations regarding wetlands.[1] The applicant and developer was Cherrywood Development, LLC, one of the appellees in this case. The other appellees are the Planning Board itself and the landowners, Mary E. and Nancy A. Engleman, who had made the initial application.

The subject property is a 53.06–acre parcel of land, situated in the R–R (Rural Residential) Zone, located on the south side of Race Track Road at its intersection with Jericho Park Road, north of the City of Bowie.

The appellant, Dr. Charles Colao, is a neighboring landowner and protestant against the application. Following the Board's approval of the Preliminary Plan, the appellant sought judicial review in the Circuit Court for Prince George's County. Judge Toni E. Clarke affirmed the Board's decision and this appeal followed.

1. There were several technical mistakes in the October 9 resolution, and a corrected resolution was filed on January 15, 2004.

## Four Environmental Issues

The appellant raises four questions for consideration. All four are environmentally related. Two of the four deal with the subject of slopes. They are:

1. Whether the Planning Board exceeded its powers by approving the application without making the required finding that any disturbed severe slopes were "isolated, small, or otherwise occur[ring] as insignificant knolls"?

2. Whether the Planning Board's decision was reversible because it failed to articulate the facts it found with respect to "adjacent slopes between 15 and 25 percent with highly erodible soils"?

The other two questions deal with wetlands. They are:

3. Whether the Planning Board's findings with respect to wetlands impacts in the Patuxent River Primary Management Area ("PMA") failed to meet the minimum requirements for articulating the facts found and the law applied?

4. Whether the Planning Board's findings with respect to the variation to allow impacts on isolated wetlands are supported by substantial evidence and are based on a correct premise of law?

## The Preliminary Scrutiny As to Environmental Protection

The application for the Preliminary Plan was submitted on April 4, 2003. The Planning Board convened a meeting of the Subdivision Review Committee. The purpose of the Review Committee is to give representatives of various agencies, departments, and offices the opportunity to comment on the proposed Preliminary Plan in order to advise the applicant of any issues that may require adjustment. The Review Committee met on April 25, 2003.

Prominent among the issues raised were comments from the Environmental Planning Section of the Maryland–National Capital Park and Planning Commission. Those comments

were reduced to a written Memorandum on April 28, 2003. The Memorandum requested that additional engineering information be submitted dealing with 1) steep slopes and 2) slopes in excess of 15% on highly erodible soils. It also requested more information about 1) impact on the Patuxent River Primary Management Area and 2) impact on wetlands. The Memorandum recommended the elimination of certain proposed disturbances, necessitating a redesign of at least a part of the subdivision proposal.

In response to the Memorandum, the applicant submitted revised plans and designs. In its subsequent comment on the revised plans, the Environmental Planning staff recommended that eight conditions be attached to the Preliminary Plan approval to ensure that the Plan conforms to all statutory requirements. The Planning Board, in turn, conditioned approval of the Preliminary Plan upon the satisfaction of 27 conditions. The applicant agreed to all of the conditions.

The applicant did request, however, a variation permitting disturbances to two small wetlands areas, one comprising .06 of an acre and the other comprising .08 of an acre. The Planning Board, following the recommendation of its staff, approved the variation in the event that the United States Army Corps of Engineers determined that the two impacted areas were isolated and were not a part of the Patuxent River Preservation Area.

## Standard of Review

■ The issues before us are very fact-intensive. The pertinent inquiry, therefore, is whether there was some "substantial evidence" before the Planning Board to support its decision, to wit, whether the issue was "fairly debatable." If the question before the Planning Board was thus fairly debatable, the reviewing court (circuit or appellate) will not disturb the ruling of the Planning Board, whichever way it went. In *Eger v. Stone*, 253 Md. 533, 542, 253 A.2d 372 (1969), the Court of Appeals discoursed on the "fairly debatable" test.

> *If the issue before the administrative body is "fairly debatable", that is, that its determination involved testimony from*

which a reasonable man could come to a different conclusions, *the courts will not substitute their judgment for that of the administrative body.*

(Emphasis supplied). *See also Germenko v. Baltimore County Board of Appeals*, 257 Md. 706, 711, 264 A.2d 825, 828 (1970).

This Court similarly explained in *Cox v. Prince George's County*, 86 Md.App. 179, 186–87, 586 A.2d 43 (1991):

> *If the issue is fairly debatable,* as shown by the record, *the Council's decision will be affirmed. Prince George's County v. Meininger,* 264 Md. 148, 152, 285 A.2d 649 (1972); *see also, Warner v. Town of Ocean City,* 81 Md.App. 176, 567 A.2d 160 (1989) (*no matter how conflicting the evidence or questionable the credibility, the court cannot substitute its judgment*). Since administrative agency decisions are *prima facie* correct and carry a presumption of validity, *we must review the Council's decision in the light most favorable to the Council.* Our role is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review.

(Emphasis supplied). *See also Mortimer v. Howard Research,* 83 Md.App. 432, 441–42, 575 A.2d 750 (1990); *Terranova v. Board,* 81 Md.App. 1, 9, 566 A.2d 497 (1989).

■ The ultimate decision on the merits is one that should be made by the administrative agency and not by the reviewing court. The Court of Appeals explained in *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961):

> *The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence.* "The Court may not substitute its judgment on the question of whether the inference drawn is the right one or whether a different inference would be better supported. *The test is reasonableness, not rightness.*"

(Emphasis supplied).

As Judge Hollander pointed out in *Department of Human Resources v. Thompson,* 103 Md.App. 175, 189, 652 A.2d 1183

(1995), moreover, the decision of the administrative agency enjoys a presumption of correctness.

> *[T]he decision of an agency is prima facie correct. On appeal, the agency decision must be viewed in the light most favorable to the agency. See also, Md. State Police v. Lindsey,* 318 Md. 325, 333, 568 A.2d 29 (1990) *(agency decision is presumptively correct* and test is whether there is substantial evidence to conclude that a reasoning mind reasonably could have reached the factual conclusion the agency reached).

(Emphasis supplied). And *see Board of Education v. Paynter,* 303 Md. 22, 35–36, 491 A.2d 1186 (1985); *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 511–13, 390 A.2d 1119 (1978). With those guidelines firmly in mind, we turn to the case at hand.

### Tenuous Preservation, At Best Across the Board

██ Let us make clear at the outset that we are keenly sympathetic to the complaint by the appellees that all of the issues now raised by the appellant have probably not been adequately preserved for appellate review. The Planning Board held a lengthy hearing on the Preliminary Plan on September 11, 2003. Numerous interested parties, including numerous protestants, testified. The transcript of that hearing runs to 150 pages. On October 9, 2003, the Planning Board filed a meticulously detailed, 28–page, single-spaced Resolution, approving the Preliminary Plan and supporting that approval with extensive findings of fact on every conceivable issue raised at the hearing or suggested by the authorizing statutes.

The appellant's present concerns about disturbing 1) wetlands and 2) severe slopes were not issues raised at the hearing. We have pored over every line of the 150–page transcript and can attest that the matters that commanded attention at the hearing were 1) the traffic flow along Race Track Road, including concerns about lowering the speed limit and improving the roadbed; 2) the accessibility of ambulance and other medical services to the planned community; 3) the

likely impact of additional population on school facilities; 4) the need for sound barriers to shield the new residents from the noise of gunfire at the adjacent Berwyn Rod and Gun Club; and 5) poignantly, the fate of the deer and raccoons now living on the land. One protestant feared that the displaced deer would end up in his own backyard, ravenously hungry; a second feared that the deer and raccoons would have no place to go and would simply die out; a third voiced concern about traffic hazards as the displaced deer crossed Race Track Road.

All issues involving environmental protection, by contrast, had earlier been the subject of intense scrutiny by the Subdivision Review Committee. The April 28, 2003, Memorandum of the Environmental Planning Section had generated extensive revision of the appellees' plans and designs. The appellees' ultimate satisfaction of the Environmental Planning staff and the Subdivision Review Committee had made these environmental questions, however, virtually *faits accompli* by the time of the hearing on September 11, 2003. The revisions to the Preliminary Plan made to satisfy the environmental concerns of the Subdivision Review Committee were, moreover, fully known or knowable by all parties at the time of the hearing.

The general rule regarding the preservation of issues in administrative cases for judicial review was enunciated by the Court of Appeals in *Cicala v. Disability Review Board for Prince George's County,* 288 Md. 254, 261–62, 418 A.2d 205 (1980):

> *A party* who knows or should have known that an administrative agency has committed an error and *who,* despite an opportunity to do so, *fails to object* in any way or at any time *during the course of the administrative proceeding, may not raise an objection for the first time in a judicial review proceeding.*

(Emphasis supplied).

Understandably, the commendably detailed Resolution of the Planning Board answered more fully those concerns that

had been raised at the hearing and dealt more summarily with other issues that had not been raised. The appellant's late-in-the-day concern with whether the Planning Board's Resolution dotted every "i" and crossed every "t" on two theretofore neglected environmental issues strikes us as little more than a case of litigational opportunism. This will not prevent us from looking at the merits of those issues, but it does affect the perspective in which we view them.

The heart of the appellant's first contention about the Planning Board's resolution of the "severe slope" problem, for instance, is that, although the Planning Board addressed the core of the problem by pointing out that "less than 25 percent of the land having steep slopes is proposed for disturbance," it neglected to mention that the affected slopes are "isolated, small, or otherwise occur as insignificant knolls." The contention is not that the affected slopes are, in fact, something other than "isolated, small, or ... insignificant knolls," but only that the Planning Board, in drafting its Resolution, did not get its abracadabra down pat. We are not about to remand the case to the Planning Board because its final examination paper got only an "A minus" instead of an "A plus."

The appellant had only to alert the Planning Board to the problem and the abracadabra would have been letter perfect. This contention is a textbook example of what *Meadowridge v. Howard County*, 109 Md.App. 410, 421–22, 675 A.2d 138 (1996), was referring to when it explained the energizing reason behind the preservation requirement.

*The primary purpose of the rule* requiring a party to raise an issue in an administrative proceeding before it can raise that same issue again on appeal *is to give the administrative agency the opportunity to decide the issue first; when an appellate court is the first to decide an issue, it deprives the agency of that opportunity. See Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 518–19, 390 A.2d 1119 (1978) (noting that " *'[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the*

*matter,* make its ruling, and state the reasons for its action.' ") (quoting *Unemployment Compensation Commission v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946)). *Cf. State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994) (rule requiring party to raise issue in criminal proceedings before appellate review of that issue may be had is to ensure fairness in case and promote orderly administration of the law; *interests of fairness are furthered by requiring attorneys to bring the position of their clients to the attention of the lower court so that the lower court can pass upon, and possibly correct, any errors in the proceedings* ).

(Emphasis supplied).

Because our resolution of this appeal on the merits will reach the same bottom line that a holding of non-preservation would reach, the result will probably be more satisfying and have more finality if it is one reached on the merits. As we segue into our consideration of the appellant's first contention, therefore, we will treat the contention as preserved—but just barely so.

### Cluster Zoning And Isolated, Small, or Insignificant Knolls

The salient characteristic of a cluster subdivision on unusual topography is that, although density will not be increased in macrocosm, it may be increased in microcosm, the better to preserve the environmental integrity of the remaining unclustered open space. More cluster here is traded for less cluster over there. Residential units will be huddled, as it were, on the lower slopes of the Mount Everest Estates so that the peak may remain inviolate.

Norman Williams, Jr., 2 *American Planning Law* (1987 Rev.), Ch. 47, "Cluster Zoning," explains the concept.

*Cluster zoning is a technique that allows the size and width of individual lots to be reduced provided that an area equivalent to the total of the areas saved from individual lots is pooled and retained as common open space.* The advantages include a better use of building sites, relief from

the monotony of continuous development, and lower subdivision building costs because of the need for fewer paved streets and other utilities. One problem that can occur with cluster zoning is the designation of truly unusual areas such as swamps as common open space. On the other hand, this is one way of preserving wetlands.

(Emphasis supplied).

Section 24–137(a) of the Prince George's County Code speaks to the purpose of a cluster subdivision.

(a) Purpose. *The purpose of cluster development is to permit* a procedure for *development which will result in improved living environments;* promote more economic subdivision layout; encourage a variety of designs of dwellings; encourage ingenuity and originality in total subdivision layout and individual site and building design; encourage compatibility with historic resources; preserve open space to serve recreational, scenic, and public service purposes; *and other purposes* related thereto, *within the densities established for the cluster net tract area.*

(Emphasis supplied).

Section 24–137(g) then deals with the criteria for approval of a plan for cluster development generally and with what to do about severe slopes specifically.

*In approving a proposal, the Planning Board shall find that the following criteria have been met,* as applicable to the particular plat or plan under consideration:

. . . .

(9) *Not more than one-fourth (1/4) of any land having slopes greater than twenty-five percent (25%) will be removed or altered, and then only when such slopes are isolated, small, or otherwise occur as insignificant knolls,* so that the design of the development or cluster open space will not be adversely affected.

(Emphasis supplied).

Section 5 of the Planning Board's Resolution approving the Preliminary Plan consisted of four pages of findings under the heading of "Cluster Findings." The Board first made its collective and overall finding.

In general, *the design for the proposed cluster subdivision meets and exceeds the* purposes and *criteria for approval of cluster developments* in the R–R Zone found in Subtitles 27–Zoning and *24–Subdivision of the Prince George's County Code.*

(Emphasis supplied).

It then proceeded to address, one by one, each of the required findings spelled out by § 24–137(g), stating first the Code provision and then the Board's specific finding. It is the ninth of these sub-findings that concerns us here.

**Not more than one-fourth (1/4) of any of the land having slopes greater than twenty five percent (25%) will be removed or altered, and then only when the slopes are isolated, small, or otherwise occur as insignificant knolls, so that the design of the development or cluster open space will not be adversely affected.**

Comment: *Less than 25 percent of the land area having steep slopes is proposed for disturbance.*

(Emphasis supplied).

The appellant, a stern taskmaster, pounces on the laconic thinness of that response.

*The Board's sentence contains no finding that the slopes to be disturbed were isolated, were small, or were insignificant knolls,* and it sets forth no fact which would support such a conclusion. The Board also did not address the relationship between the disturbances and the design of the development or open space. *In short, the Board did not apply the conditions in Criterion 9. The Board exceeded its powers by approving the plan without addressing the criterion in its entirety and without making the required findings.*

*The Board's approval of the Preliminary Plan should be vacated because the Board lacked the discretion to disregard the conditions in Criterion 9.*

(Emphasis supplied).

The appellant, however, uses tunnel vision in isolating a single sentence, one that adequately deals with the primary

condition it must respond to but neglects to mention a secondary condition. The Planning Board had already found, in § 5 of the Resolution, that the Preliminary Plan satisfied all of the criteria for approval spelled out by § 24–137.

In addition to that, § 4 of the Board's Resolution, based on the Technical Staff Report, had also made pertinent findings with respect to slopes greater than 25%. It found that of the total tract area of 53.06 acres, the area of "slopes greater than 25% outside [the] floodplain" consisted of only 2.81 acres. It further found that, of that 2.81 acres, the only area to be disturbed consisted of 0.70 acres. The very smallness of the fractional area of the entire tract consisting of such slopes and the even more minute smallness of the fractional area to be disturbed support a permissive inference that the slopes to be disturbed were, indeed, small.

The isolated nature of the slopes to be disturbed was, moreover, visually apparent on the maps that accompanied and were a part of the Preliminary Plan. The maps graphically depicted the smallness and the isolation of the pertinent slopes in a way that it is difficult for a verbal text to convey. The maps and drawings were, moreover, an integral part of what was before the Planning Board. The primary function of the Planning Board was to approve a set of maps and drawings.

The outcome of this case did not hinge on the minuscule issue of a couple of slopes, and it is to distort reality to make it the central issue of this appeal. There was no "significant knoll" casting its shadow over this determination. The developers were not about to turn the bulldozers loose on Mount Rushmore.

### 15% Slopes With Highly Erodible Soils

The theme of slopes, albeit more moderate slopes, recurs in the appellant's second contention. On this occasion, we no longer deal with "slopes of 25% or greater" but with "slopes of 15% or greater" but "with highly erodible soils." The contention seems to be (it is not all that clear) that the Planning Board did not accurately delineate the boundaries of

the Patuxent River Primary Management Area (the "PMA") because it made no findings with respect to slopes of 15% or greater with highly erodible soils. The contention is murky as to the significance of that failure to have made findings. At times the argument seems to suggest that the Planning Board must make findings for the sake of making findings.

*The Board's failure to make findings* about the presence of slopes between 15 and 25% containing highly erodible soils *fails to meet the minimum requirements for articulating the facts the Board found.*

The Board's failure to articulate findings about slopes exceeding 15% containing high erodible soils requires this Court to vacate the approval of the Preliminary Plan.

(Emphasis supplied).

At the very end of the argument, however, one can infer some relevance with respect to the drawing of the boundaries of the PMA.

The Board neither articulated the law nor found the facts necessary to its finding that the Preliminary Plan accurately depicted all of the areas within the PMA.

The appellant now claims (he did not do so at the hearing) that "a search of the record would reveal" three examples of slopes exceeding 15% with highly erodible soils that are not within the PMA as designated in the Preliminary Plan. Simply because a slope is one of 15% or greater and contains highly erodible soil, however, does not mean that it must necessarily be included in the PMA. That the larger tract may include such slopes that are not within the PMA is immaterial. The only issue is that of properly drawing the boundaries of the PMA. Whether such slopes do or do not exist outside the PMA is beside the point. The controlling definition of the PMA is provided by § 24–101(b)(11) of the Prince George's County Code.

(11) **Patuxent River Primary Management Area Preservation Area:** A buffer established or preserved along perennial streams within the Patuxent River watershed

excluding the area within the Chesapeake Bay Critical Area Overlay Zones, which as a minimum includes:

(A) All perennial streams and a minimum of 50 feet of preserved or established vegetation on the side of each bank;

(B) The one hundred (100) year floodplain;

(C) All wetlands adjacent to the perennial stream or the one hundred (100) year floodplain.

(D) All areas having slopes of twenty-five percent (25%) or greater abutting or adjoining the perennial stream, the one hundred (100) year floodplain or stream-side wetlands;

(E) *All areas having highly erodible soils on slopes of fifteen percent (15%) or greater abutting the perennial stream, the one hundred (100) year floodplain or stream-side wetlands;*

(F) Specific areas of rare or sensitive wildlife habitat, as determined by the Planning Board.

(Emphasis supplied).

Slopes of 15% or more with erodible soils are only included within the PMA if they literally abut 1) the perennial stream, 2) the 100 year floodplain, or 3) stream-side wetlands. If they do not abut one of those three things, they are not within the PMA. The appellant, however, exhibits a bit of verbal sleight-of-hand when he switches the controlling definition to one of "adjacent slopes between 15 and 25 percent with highly erodible soils." The Prince George's County Code does not use the word "adjacent" in this regard. Adjacent to what? Slopes adjacent to the PMA do not *ipso facto* become a part of the PMA.[2] They literally must abut one of the three statutorily designated starting points in order to be included.

At the hearing before the Planning Board, the boundaries of the PMA had not been remotely called into question. None of the three areas of slope now being referred to by the appellant, moreover, is within, or should be within, the PMA.

---

**2.** One is reminded of Lincoln's description of an acquisitive farmer: "He aint greedy 'bout land. He just wants what jines his."

Judge Clarke, referring to the Prince George's County Code, concluded her analysis of this contention.

*This requires identification of the highly erodible soils* in the plat that are *within the zone* of the wetland, *not every highly erodible soil on the plat. The Planning Board* reviewed substantial evidence contained in the record, which *identified highly erodible soils within the area of the plat that were to be protected; they also viewed soils in the area that were not required to be protected.* The Planning Board at the time of its decision had substantial evidence before it identifying all the highly erodible soils they needed to know about regarding this plat of land.

(Emphasis supplied). We agree.

### The Non–Authoritative and Non–Persuasive Status Of Unreported Opinions

■ The sleight-of-hand in staging this contention is legal as well as factual. The appellant cites as "controlling" authority the unreported opinion of this Court in the unrelated case of *Garner v. Prince George's County Planning Board,* No. 2715, September Term, 2003 (filed January 18, 2005). After an initial citation, the appellant then subtly eases that opinion even more inextricably into the sinews of analysis by referring to it familiarly as *Planning Board I,* while referring to the present case as *Planning Board II.*

The appellant claims for that opinion an authoritative status that is well nigh dispositive.

To the extent that the Board will litigate whether it has a duty to articulate its findings of law and fact, *that opinion is binding on the Board* under Maryland Rule 8–114(b). *The doctrines of res judicata and collateral estoppel bar the Planning Board from taking legal positions that contradict the holding in Planning Board I.*

(Emphasis supplied).

Former Maryland Rule 8–114(b) has now been renumbered, effective January 1, 2004, as Rule 1–104. It provides in pertinent part:

(a) **Not Authority.** *An unreported opinion of the* Court of Appeals or *Court of Special Appeals is neither precedent within the rule of stare decisis nor persuasive authority.*

(b) **Citation.** *An unreported opinion* of either Court *may be cited* in either Court *for any purpose other than as precedent within the rule of stare decisis or as persuasive authority.*

(Emphasis supplied). *See Corby v. McCarthy,* 154 Md.App. 446, 840 A.2d 188 (2003); *Nicholson v. Yamaha Motor Co.,* 80 Md.App. 695, 566 A.2d 135 (1989), *cert. denied,* 318 Md. 683, 569 A.2d 1242 (1990). It is hard to see how the rule could be more plainly stated than that.

### Minimizing Impact on the PMA

The appellant's final two contentions deal with wetlands. The third contention initially seems reasonably straightforward.

The Board's findings with respect to wetland impacts in the PMA failed to meet the minimum requirements for articulating the facts found, the law applied and the relationship between the two.

The argument in support of that contention, however, descends almost into incomprehensibility. It wanders back and forth between 1) wetlands that are non-isolated and part of the PMA and 2) wetlands that are isolated and not part of the PMA. The respective justifications are diametrically different, and it is impossible to formulate a coherent answer to an argument that randomly shifts from one frame of analysis to another with virtually every passing paragraph.

In an effort to bring some order to the assessment of an otherwise chaotic contention, we shall defer, until we take up the appellant's fourth contention, any discussion of the granting of variations for two isolated wetlands that are not a part of the PMA. We will, in dealing with this third contention, confine ourselves exclusively to the question of whether there was substantial evidence to support the decision of the Plan-

ning Board as it found justification for the impact of the projected development on the PMA.

With respect to the PMA, the Planning Board's Resolution of October 9, 2003, correctly identified the controlling law. *The Subdivision Ordinance,* Section 24–130(b)(5) *requires that the PMA be preserved in a natural state to the fullest extent possible.* A variation request dated March 17, 2003, was submitted but is not required if the wetlands are part of the PMA. *Proposed impacts to the PMA require a Justification Statement outlining how the PMA has been preserved to the fullest extent possible. Staff accepted the variation request* as a Justification Statement *because it identified* each of the proposed PMA impacts and provided information on *how those impacts have been minimized* in accordance with Section 24–130(b)(5) of the Subdivision Ordinance.

(Emphasis supplied).

The appellant keeps insisting that the Planning Board never stated what the law was that it was applying to the facts of this case. Section 24–130(b)(5) of the Prince George's County Code, quoted above, is, as the Planning Board clearly stated, the law that was applied. Section 6 of the Planning Board's Resolution consisted of four tightly packed pages of findings on environmental impact, including an analysis of how the approved Preliminary Plan would insure that "the PMA be preserved in a natural state to the fullest extent possible."

Only two impacts were approved in the PMA area, one for a sanitary sewer line and the other for the installation of a trail. Two other impacts that had originally been proposed were disapproved by the Planning Board, one for the construction of a stormwater management pond and the other for grading associated with that construction. The Planning Board ruled:

The proposed impacts shown in the August 13, 2003 letter from the applicant have been evaluated. All of the environmental features are within the Patuxent River watershed, and as such are elements that are to be preserved "... to the fullest extent possible." Two of the impacts shown in

the stream system are recommended for approval with the Preliminary Plan: impacts for the sanitary sewer line and for the installation of the trail. Impacts for the construction of the stormwater management pond and associated grading are not recommended for approval.

The Preliminary Plan called for no actual building lots within the PMA. There was a question, however, as to whether one lot, designated as Lot 41, was or was not within the PMA. That uncertainty called for what is known as a Jurisdictional Determination (JD) by the United States Army Corps of Engineers. At the time of the hearing by the Planning Board, the Corps of Engineers had not yet rendered its decision. (See footnote 3 *infra.*) The Planning Board's decision as to Lot 41 accordingly was conditional. If the Corps of Engineers determined that Lot 41 was within the PMA, then Lot 41 would be removed from the Preliminary Plan. Lot 41, therefore, could have no adverse impact on the PMA.

At the time of Detailed Site Plan review, the signed JD should be submitted. If the JD shows the wetland on Lot 41 to be isolated and not jurisdictional, the current road alignment and lot configuration may remain the same. *If the JD shows the wetland on Lot 41 to be Waters of the U.S. and connected to Horsepen Branch, it will be considered part of the PMA. In this event* the preliminary plan and TCPI should be revised to show the new PMA limit, *Lot 41 should be removed,* and the road shall be designed to minimize the impact to this part of the PMA, without a loss of lots over the loss of Lot 41.

(Emphasis supplied).

The Planning Board's Resolution described in detail where the two approved impacts would be located and why they were necessary.

*The two (2) proposed impacts are associated with infrastructure necessary for the development of this parcel* and a proposed trail. The extent of the proposed impacts have been reduced beyond that reflected by the original applica-

tion; however, not all of the required impacts have been requested for approval.

The first impact is associated with a proposed trail that runs between Lot 18, Block A, the stormwater management pond on Parcel C, and behind Lots 38 and 39, Block A. The second impact is required for the sewer connection to the existing sewer outfall located within the PMA. This sewer connection is located between Lot 18 and the stormwater management pond on Parcel C and behind Lot 38. The plan does not show sanitary sewer line connections for the two cul-de-sacs in the southeastern portion of the site. It is assumed that, due to the topography, another sanitary sewer line connection is needed in this area. In addition, an outfall for the proposed stormwater management pond has not been shown. It is likely that one will be required.

The impacts as shown on the revised TCPI, and additional impacts for the connection of proposed sewer lines to the existing sewer line and for an outfall from the stormwater management pond are the only impacts that the staff supports. *Staff will further evaluate the impacts during the review of the Detailed Site Plan to ensure that impacts to the PMA are only those necessary for the installation of public utilities and trails.*

(Emphasis supplied).

The Resolution then concluded that the two approved impacts were necessary for the implementation of the development and that "the PMA has been preserved to the fullest extent possible."

*At the time of Detailed Site Plan, the design of the entire area will be evaluated in more detail to determine if the impacts can be limited to those necessary for the trail construction through the PMA and whether the sewer line connection can be made within the same corridor.*

*The proposed impacts to the PMA are the least necessary for implementation and the PMA has been preserved to the*

*fullest extent possible,* within the context of the findings of this report and the recommended conditions.

(Emphasis supplied).

In addition to the above, the Planning Board also imposed the following condition on its approval of the Preliminary Plan:

*At the time of review of the Detailed Site Plan the Environmental Planning Section shall ensure that the sanitary sewer extensions are located in a manner to ensure [that] the least disturbance is proposed for the installation of sanitary sewer and trail connections within the PMA,* as determined by the Environmental Planning Section and approved by the Planning Board.

(Emphasis supplied).

We hold that the Planning Board's decision in this regard was both legally and factually free from error.

## Variances and Variations

Before attempting to decide whether the rules of the game have been violated, it behooves us to identify the game being played. Both the appellant and the appellees ideally should speak the same language and invoke the same rules. On March 17, 2003, the appellees requested a variation. On October 9, 2003, the Planning Board granted the variation. Throughout its Resolution, the Planning Board spoke only of a variation and never of a variance.

In his fourth contention, however, the appellant alleges that the granting of the variation did not satisfy variance law. All of the caselaw cited by the appellant deals with the admittedly more familiar zoning phenomenon known as a variance. In his appellate brief, the appellant flatly states, "There is no material difference between what Prince George's County calls a variation and what other jurisdictions call a variance. The Maryland courts have developed a body of case law on variances, and that law also governs this case."

Even if the appellant's argument is in the right pew, it is in the wrong church. The word "variation" is not a mere homespun curiosity of Prince George's County dialect. It is,

in Prince George's County land planning law, a precise term of art. It is, moreover, a term of art separate and distinct from the different term of art "variance." We are not dealing with variances in this case. The Prince George's County Zoning Ordinance, to be sure, deals with variances in § 27–230 of that ordinance. It deals with very particular parcels of ground. The criteria that must be satisfied for a variance to be granted are spelled out in § 27–230(a):

(a) *A variance may only be granted when the Board of Appeals finds* that:

(1) A specific parcel of land has exceptional narrowness, shallowness, or shape, exceptional topographic conditions, or other extraordinary situations or conditions.

(2) The strict application of this Subtitle will result in peculiar and unusual practical difficulties to, or exceptional or undue hardship upon, the owner of the property; and

(3) The variance will not substantially impair the intent, purpose, or integrity of the General Plan or Master Plan. (Emphasis supplied).

Variations, by contrast, are dealt with by § 24–113. That section, in longer perspective, is not a part of the Zoning Ordinance. It is a part of Subtitle 24 of the County Code, dealing expressly with the subject of "Subdivisions." Whereas a variance "may only be granted [by] the Board of Appeals," it is the Planning Board that approves variations. The departures "from strict compliance" that are permitted by variations are not self-contained phenomena but are pieces of a significantly larger plan. Section 24–113(a) provides, in pertinent part:

(a) *Where the Planning Board finds* that extraordinary hardship or practical difficulties may result from strict compliance with this Subtitle and/or that the purposes of this Subtitle may be served to a greater extent by an alternative proposal, *it may approve variations from these Subdivision Regulations* so that substantial justice may be done and the public interest secured, provided that such variation shall not have the effect of nullifying the intent

and purpose of this Subtitle; and further provided that the Planning Board shall not approve variations unless it shall make findings based upon the evidence presented to it in each specific case that:

(1) The granting of the variation will not be detrimental to the public safety, health, or welfare, or injurious to other property;

(2) The conditions on which the variation is based are unique to the property for which the variation is sought and are not applicable generally to other properties;

(3) The variation does not constitute a violation of any other applicable law, ordinance, or regulation; and

(4) Because of the particular physical surroundings, shape, or topographical conditions of the specific property involved, a particular hardship to the owner would result, as distinguished from a mere inconvenience, if the strict letter of these regulations is carried out.

(Emphasis supplied).

On the confusion of variances and variations, Judge Clarke first stated the appellees' position and then her agreement with it.

Respondents point out that *a variance and variation are two different things* and that Petitioner is confused regarding which the Planning Board issued. Respondents point out that while stating that the Planning Board incorrectly issued a variation, all of the case law and support Petitioner presented was based on the standard of issuing a variance. Respondents state that *the two (variance and variation) are different and have different standards.*

*This Court agrees* with Respondents, *Petitioner confused the standards for variance and variation.*

(Emphasis supplied). Our only discussion henceforth will be of variations and not of variances.

### The Variation

■ The variation involved two small and isolated areas of wetland, designated by the Planning Board as Impact Area

# 1, consisting of .06 of an acre, and Impact Area # 2, consisting of .08 of an acre. Applying the criteria of § 24–113(a), the Planning Board made the following findings with respect to both impact areas.

Granting the variations will not be detrimental to the public safety, health or welfare or be injurious to another property because the wetlands are isolated.

The conditions upon which the variations are based are unique to the property because the two areas of isolated wetlands do not commonly occur on other properties.

The approval of the variation does not constitute a violation of any other applicable law, ordinance, or regulation because copies of state and federal permits are required prior to the issuance of any permit on the site.

With respect to Impact Area # 1 specifically, the Planning Board found:

Impact Area # 1 is a clearly isolated area that has no connection to the stream system.

Impact Area # 1 is located in an open field and appears associated with the horse-related use of the property.

*A particular hardship to the owner would result if Impact Area # 1 were not approved.* The lot layout has been substantially redesigned to preserve natural features, and the location of the isolated wetland at Impact Area # 1 is such that its preservation is extremely difficult. *Impact Area # 1 actually lies within a cleared area of the site in the center of a ridge which has streams with steep slopes on either side. The proposed main road entering the subdivision runs along this ridge. There is no way to access the ridge from elsewhere in the subdivision with less environmental impact than that proposed. If the variation to Impact Area # 1 is not approved, a substantial loss of the lots would likely occur.*

(Emphasis supplied).

The Planning Board further found with respect to Impact Area # 2 specifically:

The staff report contains a condition whereby Impact Area # 2 will be eliminated if, during state or federal review, the wetlands are determined to be part of the overall stream system and should not be impacted.

*Impact Area # 2 is located at a high point and likely does not serve a substantial environmental purpose.*

Impact Area # 2 is only recommended for approval if it is found by state and federal agencies to not be a part of the adjacent waters of the U.S. *Requiring the preservation of an isolated wetland that has no connection to the waters of the U.S. does not result in a substantial environmental benefit and would result in the elimination of a lot in the subject location, and the Planning Board finds that it would result in a particular hardship.*[3]

(Emphasis supplied).

By conflating variances and variations, the appellant's argument is analytically flawed from the outset. He cites no law (and we know of none) that holds that what the law says of variances should also apply to variations: "[T]here is a presumption against variances;" "Very few cases have upheld the grant of a variance;" "Variances are granted sparingly only in rare cases."

Variations, however, do not suffer under such an anathema. Subdivision law is not so unforgiving. Isolated and limited departures from strict compliance are contemplated and expected, not simply because of "extraordinary hardship" but even because of "practical difficulties." The "particular hardship to the owner" is balanced against the possible harm done. That is why the findings of the Planning Board in this case were highly pertinent that the two isolated wetlands in question were environmentally insignificant and that no real dam-

---

3. The brief of the appellee Maryland–National Capital Park and Planning Commission informs us that, as of January 4, 2004, the Army Corps of Engineers rendered its verdict with respect to the PMA status of Impact Area # 2 (Lot 41). It is not isolated and is not a part of the PMA. It is, therefore, a proper subject for the variation, a variation that is no longer merely conditional. The appellant does not gainsay this report.

age would be done by the approval of the variation. The scales might tip in a very different fashion if it were a variance being weighed in the balance. Judge Clarke concluded:

> According to the standard of the Prince George's County Code § 24–113, the Planning Board appears to have had ample required evidence to issue a variation.

We see no error.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**